## COMMONWEALTH vs. WELDON E. BURDEN.

Suffolk. January 13, 1983. — April 21, 1983.

Present: HALE, C.J., ARMSTRONG, & WARNER, JJ.

*Homicide. Joint Enterprise. Jury and Jurors. Practice, Criminal,* Continuance, Change of venue, Examination of jurors, Fair trial, Comment by judge, Cameras in courtroom, Instructions to jury, Disclosure of Commonwealth's theory of case. *Evidence,* Hearsay, Spontaneous utterance. *Witness,* Polygraph examination.

The judge in a murder case did not abuse his discretion in denying the defendant's motion for a change of venue and for a continuance because of extensive pretrial publicity. [672]

At a murder trial there was no error in the judge's refusal to permit the defendant's attorney to conduct the voir dire examination of prospective jurors. [672-673]

At the trial of a black defendant charged with the rape and murder of a white woman, the judge did not err in refusing to ask prospective jurors specific questions proposed by the defendant concerning racial prejudice, pretrial publicity, and attitudes toward sex crimes where the judge's questioning of prospective jurors on these matters was adequate. [673-674]

The judge in a murder case did not abuse his discretion in denying the defendant's motion for additional peremptory challenges of jurors where the defendant made no showing that he needed such additional challenges in order to obtain an impartial jury. [674-675]

There was no reversible error at the trial of a murder case in the judge's telling jurors before empanelment that their views on capital punishment were of no concern to the court and that capital punishment no longer existed in Massachusetts. [675]

At a murder trial the judge did not err in permitting a witness to relate the description of her assailants given by the victim minutes after the stabbing in response to questions asked by the witness, on the theory that the victim's answers were spontaneous utterances admissible as an exception to the hearsay rule. [676-677]

In the circumstances the judge at a murder trial did not err in permitting television cameras in the courtroom over the objection of both the defendant and the prosecutor. [677-678]

The judge at a murder trial did not abuse his discretion in denying the defendant's motion to compel the Commonwealth's chief witness to take a polygraph examination and in denying the defendant's subsequent motion to order such an examination for sentencing purposes. [678-679]

At a murder trial a statement by the judge in instructing the jury that polygraph examinations "can only be taken, now, by a defendant if he wants to," did not, in context, constitute an improper comment on the defendant's failure to take a polygraph examination. [680-681]

At a murder trial there was no error in the judge's instructions on withdrawal from a joint enterprise in which he said that for a withdrawal to be effective the defendant would have to disassociate himself from the enterprise within an appreciable time before the murder and that in determining whether the defendant withdrew from the joint venture the jurors could consider whether the defendant shared in the proceeds of the robbery. [681-682]

A defendant on trial for rape, murder, and robbery was not denied fair notice of the charges against him by the denial of his oral motion, made after the prosecutor's opening statement, to compel the prosecutor to specify whether he was proceeding on a theory that the defendant had committed the offenses himself or that the defendant was responsible for his associate's crimes on a joint venture theory. [682]

A defendant convicted of second degree murder was not entitled to interview jurors to determine whether their verdict of second degree murder was a compromise based on a judgment that the defendant was no more culpable than an associate in the crimes in question who had been allowed to plead guilty to second degree murder. [682]

INDICTMENTS found and returned in the Superior Court Department on March 26, 1981.

The cases were tried before *Brogna, J.*

*Ellen K. Wade* for the defendant.

*Newman Flanagan,* District Attorney (*Muriel Ann Finnegan & Robert J. Schilling,* Assistant District Attorneys, with him) for the Commonwealth.

HALE, C.J. The defendant was convicted on indictments charging him with breaking and entering, armed assault in a dwelling, armed robbery and aggravated rape. He was also convicted of second degree murder on an indictment charging him with murder in the first degree.

Commonwealth v. Burden.

He appeals from those convictions and assigns as error (1) the judge's denial of several motions brought to mitigate extensive pretrial publicity; (2) the judge's instruction to the venire that capital punishment did not exist in Massachusetts; (3) the admission of hearsay statements of the victim; (4) the failure to exclude television cameras from the courtroom; (5) the judge's denial of his motion to compel the principal prosecution witness, one Matthew Farley, to submit to a polygraph examination; (6) the judge's instruction to the jury that the defendant could have taken a polygraph examination "if he wants to"; (7) the judge's instruction regarding joint venture; (8) the denial of the defendant's motion to compel the prosecution to state its theory of the case; and (9) the denial of the defendant's motion for posttrial interviews of the jurors for sentencing purposes. We find no error and affirm the convictions.

The following are some of the facts which the evidence warranted the jury in finding. On Saturday, March 14, 1981, at approximately 1:00 P.M. Deborah Smith, a twenty-eight year old nurse employed by Beth Israel Hospital, was robbed, raped, and murdered in her apartment in Boston. After the assault, Smith phoned the police and told the dispatcher that she had been stabbed and needed an ambulance. Shortly thereafter, but before an ambulance arrived, Pamela Rollins, a nurse practitioner, was walking up the stairs when she heard Smith say, "Get a doctor," and went to her aid. Rollins asked Smith what had happened, and Smith responded that she had been raped and stabbed.

Rollins then called 911 and reported what she had observed and the need for an ambulance. She returned to the victim and checked her for injuries. She discovered a wound three or four centimeters in length on the victim's right side, just below her rib cage. Rollins went to the bathroom, got a towel and put it over the wound. She asked Smith if she had any medical problems or allergies. She then asked the victim if she could tell who had done this to her and Smith replied, "Two black men." When asked how old they were, Smith said, "in their twenties," and

stated they were "about six-two" when Rollins asked how tall they were. Because the victim was losing consciousness, Rollins could obtain no further information. The ambulance arrived shortly thereafter, but Smith died of a stab wound four to six inches deep which cut through her liver and aorta, causing a massive hemorrhage. Sperm cells were detected in a vaginal swab and wash taken from the victim.

When the police arrived at the scene they found that the door to Smith's apartment had been smashed open and was hanging only by the uppermost of its three hinges. The apartment from that door to the rear wall was open and was comprised of living, dining, and kitchen areas. The bedroom was separate and adjoined the kitchen through a short hallway. On the floor of the living area the police found a blood-stained plate glass table top. A trail of blood led from the living area to the dining area where a pair of blood stained dungarees, torn at the crotch, lay on the floor. The trail of blood continued through the kitchen area and then led to the left and extended into the victim's bedroom. There at the foot of the victim's blood stained bed was a small pile of clothes, some of which were blood stained. Various credit cards and cards of similar size were strewn about the floor. Blood was spattered on the floor and wall and on a closet door.

There were several eyewitnesses to the aftermath of the crime. Three men who were outside the building saw Farley leave the building and run across Commonwealth Avenue. He was followed by Burden, who was carrying a stereo turntable. The three men became suspicious and began to pursue Farley and Burden. Burden dropped the turntable, and a chase enused, but Farley and Burden escaped. During the pursuit, another witness observed that Farley had a black camera slung around his neck. Burden's fingerprints were later found on the turntable.

On the evening of March 16, 1981, the police received a call from a Jeanette Johnson, who lived in the same apartment building as the defendant. Johnson told them that

Burden and Matthew (she could not pronounce Farley's last name) had killed Smith. Following a meeting with and statements by Johnson and a Wanda Murphy, police secured a warrant to search the apartment where Burden and Farley were staying. The search resulted in the seizure of coins and hundreds of pieces of jewelry, a number of which were identified as having belonged to Smith. Some of these pieces had been given by the defendant to his girlfriend, who was wearing them at the time of the search. Also found were clothes with human blood stains and a buck type knife having a four inch blade, which a medical examiner later testified could have caused the fatal wound.

Two weeks before trial Farley agreed to a plea bargain. By its terms the district attorney would recommend the acceptance of a plea of guilty to murder in the second degree with any other sentences to run concurrently with that imposed on the murder indictment should Farley testify against the defendant.

Farley testified at trial that he and the defendant decided on March 14, 1981, to break into the apartment. Thinking no one was home, Farley and Burden broke open Smith's apartment door. As they entered the apartment, they saw Smith, and Burden chased her into the bedroom, grabbed her by the hair, hit her, demanded money, used his knife to rip her jeans off, raped her, and then stabbed her. While Burden was engaged in these acts, Farley was collecting jewelry, a camera, a stereo, and other valuables. They ran from the scene and split up a few blocks away. Farley later returned to their own apartment where Burden met him at the door and said, "I killed the bitch." Farley and Burden then went to Cambridge to sell the camera, after which they split the proceeds.

Burden also testified. He admitted to breaking into Smith's apartment on March 14, 1981, after deciding no one was home. He testified that Farley had a knife with him which he used to turn the cylinder on Smith's door. According to Burden, they did not encounter the victim on entering the apartment. Burden checked one side of the apartment

and Farley the other. Burden spotted a stereo and began dismantling it and looking for something to carry it in. When he heard a woman's voice, he entered a bedroom, where he saw Farley holding his hand over a woman's mouth. The defendant said they should leave, but Farley told him to pack up the stereo and that he would get everything from the bedroom. After Burden collected the stereo, he yelled to Farley that he was ready to go. Not receiving a reply, he returned to the bedroom where he saw Farley on top of Smith. Burden then said, "Matt, you crazy man, this ain't the deal man. I'm going." He then left the building, picking up the turntable on his way. Farley ran past him on the way out. Burden admitted to selling Smith's camera and splitting the proceeds later that day.

We now address each of the defendant's assignments of error.

1. *Pretrial Publicity.*

The defendant urges that, in light of extensive pretrial publicity, the trial judge's refusal to grant at least some of the relief requested in his motions (namely for a change of venue, a continuance, attorney-conducted voir dire, an expanded and more probing jury selection voir dire, and for additional peremptory challenges) denied him his constitutional right to a fair trial by an impartial judge.

At the time of the murder, there was extensive media coverage of the incident. Approximately forty articles concerning it appeared in local newspapers between March 15, 1981, and April 3, 1981. Additionally, all major television stations covered the killing on their March 14 evening news and ran follow-up segments during the next two weeks.

The trial judge was well aware of the potential difficulties resulting from the coverage. He repeatedly instructed the entire venire that only those individuals who could make a determination of guilt or innocence based solely on the evidence as it came before them in court and the law as the judge instructed them would be acceptable jurors. In addition, every individual subsequently empanelled was asked whether he would able to put out of his mind anything that he might have heard or read of the case.

Finally, each juror was sequestered from the time he was first sworn, and access by the jurors to media reports was appropriately limited.

(a) *Change of venue and continuance.* Traditionally, the matters of change of venue and continuance are within the discretion of the trial judge. *Commonwealth* v. *Gilday,* 367 Mass. 474, 491 (1975). *Commonwealth* v. *Small,* 10 Mass. App. Ct. 606, 609 (1980). *Commonwealth* v. *Rahilly,* 13 Mass. App. Ct. 917, 918 (1982), *S.C.* 388 Mass. 1005 (1983). The burden is upon the moving party to show prejudice necessitating the relief sought. *Irvin* v. *Dowd,* 366 U.S. 717, 723 (1961). *Commonwealth* v. *Gilday, supra* at 491. *Commonwealth* v. *Turner,* 371 Mass. 803, 807 (1977). "[P]retrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." *Nebraska Press Assn.* v. *Stuart,* 427 U.S. 539, 565 (1976). Moreover, "[i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin* v. *Dowd, supra* at 722-723.

The defendant presented no evidence that there had been any unusual media coverage during the six months preceding the trial. Moreover, the defendant could point to no specific prejudicial information that had been covered by the media but which he anticipated would not be admitted at trial. During voir dire every individual who was eventually empanelled stated that he would be able to ignore whatever he had read or heard of the case and to decide the case solely on the basis of what would be heard in the courtroom. In these circumstances, the trial judge did not abuse his discretion in denying the defendant's motion for a change of venue and for a continuance.

(b) *Voir dire.* There is no merit in the defendant's claim of error in the trial judge's denial of his motion to permit his attorney to conduct voir dire examination of prospective jurors. In this Commonwealth, the voir dire examination

of prospective jurors is customarily conducted by the judge. *Commonwealth* v. *DiStasio,* 294 Mass. 273, 280 (1936). The court is not required to permit attorney-conducted voir dire. *Id. Commonwealth* v. *Walker,* 379 Mass. 297, 299 (1979).

The defendant further requested expanded and open ended questioning of prospective jurors concerning (i) racial prejudice; (ii) the pretrial publicity; and (iii) attitudes toward sex crimes. Contrary to the defendant's contention, there was no error in the trial judge's refusal specifically to ask nine of the numerous voir dire questions proposed by the defendant.

"Traditionally we have held that it is within the wide discretion of the trial judge whether to refine or improve on the subjects of G. L. c. 234, § 28, by going into more detail . . . . 'If trial by jury is not to break down by its own weight, it is not feasible to probe more than the upper levels of a jurors mind.' L. Hand, J., in *United States* v. *Dennis,* 183 F.2d 201, 227 (2d Cir. 1950), affd. on other grounds, 341 U.S. 494 (1951). We have been content to allow the trial judge a fair leeway in deciding how deep the probe should go, having in view the nature of the case as the judge apprehends it at the start." *Commonwealth* v. *Harrison,* 368 Mass. 366, 371 (1975). See also *Commonwealth* v. *Nickerson,* 388 Mass. 246, 248-249 (1983).

(i) With respect to racial prejudice, the judge called to the attention of the prospective jurors, individually and out of the hearing of the rest of the venire, that the defendant was a black man and that the victim of the rape and murder was a white woman, and inquired of them whether this difference in color would influence their judgment. In addition, every juror, prior to being seated, was asked whether, given a black witness and a white witness, they would be more apt to believe one witness over the other, based on color. Finally, most of the empanelled jurors (apparently the nonblacks) had been asked whether they believed a black man was more apt to commit crimes of the type here involved than a member of any other racial group.

Even under the constitutional safeguards required in cases involving a defendant who is a special target of racial prejudice (see *Ham* v. *South Carolina*, 409 U.S. 524 [1973]), the trial judge's voir dire satisfied both G. L. c. 234, § 28, as amended through St. 1975, c. 335, and *Commonwealth* v. *Sanders*, 383 Mass. 637, 637-638 (1981) (a case involving a rape and stabbing of a white woman in her apartment by a black man, wherein the Supreme Judicial Court held that "in similar trials hereafter jurors are to be examined with respect to racial prejudice, pursuant to the statute, 'individually and outside the presence of other persons about to be called as jurors or already called'").

(ii) With regard to pretrial publicity, as above noted, each individual eventually empanelled was asked whether he had heard or read anything about the case and whether he would be able to put any such information completely out of his mind.

The defendant is entitled to no more than "individual inquiry concerning possible exposure to prejudicial pretrial publicity about the facts of this case." *Commonwealth* v. *Estremera*, 383 Mass. 382, 391 (1981). The voir dire was sufficient on this point.

(iii) As to attitudes toward sex crimes, the judge tried to pinpoint those prospective jurors with strong feelings regarding such crimes by asking whether the prospective juror or any close relative or friend had ever been a victim of or accused of any of the crimes involved in this case. He further asked whether there was any reason whatsoever why the prospective juror could not decide the case fairly and impartially. The voir dire on this issue was adequate. The judge was not required to ask the specific questions requested by the defendant. See *Commonwealth* v. *Bailey*, 370 Mass. 388, 399-400 (1976); *Commonwealth* v. *Chretien*, 383 Mass. 123, 134-135 (1981).

c. *Peremptory challenges.* There was no error in the denial of the defendant's motion for additional peremptory challenges. While Mass.R.Crim.P. 20(c)(1), 378 Mass. 890 (1979), does not specifically authorize the judge to grant

this request and the defendant has cited no authority in support of his contention, we nonetheless assume that the judge has the discretionary power to do so. There is nothing whatever to indicate that the judge abused his discretion in denying the defendant's motion. The defendant made no showing to the trial judge, or to us on appeal, that he needed additional peremptory challenges in order to obtain an impartial jury. See *United States* v. *Gullion*, 575 F.2d 26, 29 (1st Cir. 1978).

2. *Comments on Capital Punishment.*

Apparently in order to avoid jurors seeking to be excused on the basis of their views about the death penalty, the judge told each member of the venire prior to individual voir dire that their views on capital punishment were of no concern to the court and that capital punishment no longer existed in Massachusetts. Despite the validity of the court's reasons for so commenting, we follow the action of the Supreme Judicial Court in *Commonwealth* v. *Smallwood*, 379 Mass. 878, 883 (1980), and "reaffirm the general rule against instructing the jury on sentencing and stress that the judge should not have [made such comments]. Nevertheless, under the particular circumstances of this case we do not find that the judge's [comments], however ill-advised, amounted to error of reversible magnitude."

The comments in the present case occurred at the preempanelment stage. In *Smallwood* the court found that there was no reversible error where a similar remark was made in the course of the judge's charge to the jury, a much more crucial stage in a criminal proceeding. Moreover, defense counsel exposed the jury, more fully than had the judge, to the punishments which would result to the defendant from their verdict when he elicited from Farley on cross-examination his knowledge of the potential sentences available for murder both in the first and second degree. Finally, the fact that the defendant was convicted of second degree murder, rather than first, belies his contention that the judge's comments made it "easier" for the jury to convict him.

3. *Hearsay Statements of the Victim.*

The trial judge, over defense counsel's objection, permitted Pamela Rollins to relate to the jury the description of Smith's assailants which Smith gave minutes after the stabbing in response to the series of questions asked by Rollins, on the theory that those answers were spontaneous utterances admissible as an exception to the hearsay rule. The defendant claims error in that the statements were neither spontaneous nor exclamatory. There was no error in the admission of the questioned statements.

It is settled that "a statement is admissible if its utterance was spontaneous to a degree which reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize and explain the underlying event." *Blake* v. *Springfield St. Ry.*, 6 Mass. App. Ct. 553, 556 (1978). *Commonwealth* v. *Hampton*, 351 Mass. 447, 449 (1966). *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 222 (1973). Liacos, Massachusetts Evidence 351 (5th ed. 1981). The trial judge is given broad discretion in determining whether an utterance meets the tests of admissibility, and his ruling will be revised only in clear cases of an improper exercise of discretion. *Commonwealth* v. *Hampton, supra.*

The statements need not be strictly contemporaneous with the exciting event but must have been made before there was time for the emotional trauma associated with that event to subside. *Commonwealth* v. *Hampton, supra* at 449. *Commonwealth* v. *McLaughlin, supra* at 223. In the instant case, the victim's description of her assailants was unquestionably made when she was still under the physical and emotional shock of the rape and stabbing. She had sustained a four-to-six-inch deep stab wound and was moaning when Rollins came upon her. She had lost much blood, was becoming weak, and was soon to expire. Certainly, the victim's statements related to the underlying event. That she was asked several questions, prior to giving these responses, and that her description arose from nonsuggestive questioning are factors to be considered by the trial judge but are not dispositive. *Commonwealth* v. *Hampton, supra* at

449-450 (trial judge did not err in admitting statement of victim made five or six minutes after stabbing in response to a question).

The trial judge acted well within his discretion in determining that the utterances were made in circumstances which reasonably negated premeditation and were sufficiently proximate to the event so as to be admissible under the spontaneous utterance exception to the hearsay rule.

4. *Failure to Exclude Television Cameras.*

After the jury were empanelled, the court questioned each juror with regard to the presence of television cameras in the courtroom. The foreman responded that the presence of television cameras might impair his ability to concentrate and his ability to reach a fair and impartial verdict free from any real or imagined pressure. Two other jurors stated that they thought the cameras would affect their ability to concentrate though not their ability to reach a fair verdict. The trial judge instructed the jurors that if at any time during the trial they should find that the television cameras interfered with their ability to concentrate or their ability to reach a fair and impartial verdict, they were to let the court officers know.

Effective April 1, 1980, the Supreme Judicial Court suspended the provision of rule 3:25 3A(7) of the Rules of the Supreme Judicial Court, which had prohibited the use of cameras and recording equipment in courtrooms. In its place the court, through an advisory committee, issued "Guidelines for an Experiment in Media Coverage of Judicial Proceedings." Those guidelines were designed to "provide insofar as possible, the opportunity for full and unrestricted coverage" of judicial proceedings. Under the guidelines "a judge may limit or temporarily suspend media coverage if it appears that a substantial likelihood of harm to any person or other serious harmful consequences will result from such coverage." In the present case, the trial judge found that he could not make the findings required by the guidelines to limit coverage and allowed the televising of the defendant's trial over the objection of both the defense

and the prosecution. This allowance obviously was subject to change should any juror report problems because of it. No juror came forward during the trial with any complaint concerning television coverage.

In *Chandler* v. *Florida,* 449 U.S. 560 (1981), the United States Supreme Court upheld the right of the States to provide for radio, television and still photographic coverage of criminal trials for public broadcast, notwithstanding the objection of the accused. The court recognized that "[t]he risk of juror prejudice is present in any publication of a trial, but the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the media's coverage of his case — be it printed or broadcast — compromised the ability of the particular jury that heard the case to adjudicate fairly." *Id.* at 575. The defendant had the burden of proving specific prejudice. "[S]omething more than juror awareness that the trial is such as to attract the attention of broadcasters" is required. *Id.* at 581.

The fact that the foreman of the jury felt that the presence of television cameras "might" affect his ability to concentrate or to render an impartial verdict and that two other jurors indicated they "thought" it would affect their ability to concentrate cannot substitute for a showing that the defendant was actually prejudiced by the presence of television cameras at the trial when these same jurors, by not coming forward during the trial, in accordance with the trial judge's instruction, demonstrated that they were in fact able to concentrate and render a fair and impartial verdict and that their initial reservations were unwarranted. There was no error.

5. *Polygraph Examination of Farley.*

After the testimonial part of the trial had begun, the defendant filed a written motion for the judge to compel the Commonwealth's prospective chief witness, Farley, to take a polygraph examination. Farley, on the advice of counsel, declined to submit to such an examination. The judge denied the motion. At that time there was no authority in this Commonwealth or anywhere else that counsel could

cite for or against such a request. The judge and counsel agreed that the question was an "open" one. The judge had shortly before referred to *Commonwealth* v. *Stewart*, 375 Mass. 380, 384-385 (1978), and had raised the question of the violation of the witness's rights under the Fifth Amendment to the United States Constitution were he compelled to take a polygraph examination over his objection. The defendant's solution to this problem was to suggest that Farley take the stand, thus waiving his Fifth Amendment rights as to related facts (*Taylor* v. *Commonwealth*, 369 Mass. 183, 189-190 [1975]), and then at the conclusion of direct examination compel him to take the test. We pursue our discussion of the case in that posture.

We now know with the benefit of hindsight that, absent a stipulation as to the admissibility of the results of such an examination, the results would have been inadmissible. *Commonwealth* v. *DiLego*, 387 Mass. 394, 398 (1982). The judge apparently made his ruling on the basis that such a stipulation would be made by the defendant, and we shall so regard it. In that position, we believe that the results would be admissible, if at all (*id.* at 397), only in the discretion of the trial judge. See *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 431 (1974). *Commonwealth* v. *Vitello*, 376 Mass. 426, 430 n.2 (1978). Here the remarks of the judge indicate that his denial of the motion was at least in part in the exercise of his discretion. In the circumstances there was no abuse of that discretion.

As to the defendant's motion to order such an examination for sentencing purposes, the defendant's proposition would have opened the door to evidence at sentencing, the purpose of which would have been to impeach the jury's verdict. "This court recognizes a policy against the impeachment of jury verdicts." *Commonwealth* v. *Dalton*, 385 Mass. 190, 194 n.4 (1982). The sentencing procedure is not an occasion for questioning the credibility of witnesses. That function is solely within the province of the jury. *Commonwealth* v. *Bohannon*, 376 Mass. 90, 94-95 (1978). There was no error in the denial of the defendant's two motions.

6. *Instruction Regarding Polygraph Tests.*

During cross-examination, defense counsel asked Farley if he would submit to a polygraph test. Over prosecution objection the trial judge allowed the witness to answer and then instructed the jury as set out in the margin.[1] The defendant objected to the instruction, but he did not seek further curative instructions despite a suggestion by the prosecution that he do so. The defendant does not now argue that the judge's statement was an incorrect or incomplete statement of the law. The only part of the statement that the defendant claims was harmful is the words "They [polygraph examinations] can only be taken, now, by a defendant if he wants to." The defendant now argues that by those words the judge directly commented "on the defendant's failure to take a polygraph examination. The obvious inference for the jury was that the defendant had some reason for not taking the examination. This inference was both prejudicial and improper, since the defendant had the privilege of deciding not to take the polygraph."

---

[1] "Now, Mr. Foreman, and other members of the jury: Several days ago, the defense made a motion that I order this witness to submit to a polygraph test, commonly known as a 'lie detector test.' I denied that motion. I put on the record my reasons. They were, as I recall them, substantially as follows:

"First, that there is a decision of our Supreme Court that says that a defendant, a witness cannot be compelled, nor may a defendant be compelled to take a lie detector test, especially where this witness is and was under indictment. He has a right not to incriminate himself.

"The second reason was that we could find — and I had law clerks — I looked myself, and defense counsel looked — and we could find no decision in any state in the United States which authorized the judge to do what the defendant asked me to.

"Thirdly, I think I gave as a reason that the present state of the development of polygraph tests, where a defendant is unwilling to take, or a subject is unwilling to take a polygraph, and/or where he has been a participant in one or more crimes, the results of the polygraph test are not sufficiently reliable to be admitted in evidence. Our Supreme Court has recently, by decision changed their rules on polygraph tests. They can only be taken, now, by a defendant if he wants to. A defendant in the case on trial; not a witness.

"You are the lie detectors; not a polygraph test."

It is black letter law that a judge may not comment on a defendant's failure to produce evidence in his behalf (*Commonwealth* v. *Goulet,* 374 Mass. 404, 412 [1978]), and a comment on the failure to take a polygraph examination would run afoul of that rule. The judge's remarks were general, except in the first paragraph, where he referred to "this witness." He informed the jury of his view of the law regarding the taking of polygraph examinations. The remark objected to was no more a commentary on the defendant's failure to take such an examination than a judge's proper instruction that a defendant may, but need not, testify in his own behalf would be a commentary on his failure to testify.

Even viewed as directed to the defendant's failure to take a polygraph test in this case, the phrase objected to was harmless beyond a reasonable doubt because the judge also informed the jury that a defendant cannot be compelled to take a polygraph test, that the results of such a test are of questionable reliability, and, more importantly, that they, the jurors, and not the polygraph, were the only lie detectors.

7. *Instructions Regarding Joint Venture.*

The defendant would fault the judge's charge on joint enterprise on two points concerning withdrawal from the enterprise.

(a) He contends that the judge erred in using the "appreciable time" factor when he charged that for a withdrawal to be effective the defendant would have to disassociate himself from the enterprise within an appreciable time before the murder. That charge was appropriate in this case. See *Commonwealth* v. *Green,* 302 Mass. 547, 554-555 (1939); *Commonwealth* v. *Lussier,* 333 Mass. 83, 90-91 (1955); *Commonwealth* v. *Dellelo,* 349 Mass. 525, 530-532 (1965); *Commonwealth* v. *Dussault,* 2 Mass. App. Ct. 321, 327 (1974).

(b) The judge's instruction that the jury "may take into consideration whether or not [the defendant] participated in the proceeds of the robbery" in determining whether he

withdrew from a joint venture, was also correct. *Commonwealth* v. *Dellelo, supra* at 530-532. See also *Commonwealth* v. *Green, supra* at 554-555; *Commonwealth* v. *Blow*, 370 Mass. 401, 408 (1976).

There was no error in the judge's charge on joint enterprise when it is read in its entirety and in the context of the whole charge.

8. *Fair Notice of Charge.*

There is no merit to the defendant's claim that the denial of his oral motion, made after the prosecutor's opening statement, to compel the Commonwealth to specify whether it was proceeding on a theory that the defendant himself had committed the offenses or was a joint venturer in Farley's crimes denied him fair notice of the charges against him. Even had the motion for specifications been timely filed in writing (Mass.R.Crim.P. 13[b][1]), the Commonwealth would not have been required to specify the theory under which it intended to proceed. *Commonwealth* v. *Williams*, 364 Mass. 145, 149 (1973).

9. *Postverdict Interviews of Jurors.*

Following the convictions, the defendant moved for permission to interview the jurors to determine whether their "compromise verdict" of second degree murder was based on a judgment that the defendant was no more culpable than Farley. The defendant sought this information to present to the sentencing judge at disposition. The court denied this motion and the defendant alleges that error on appeal. There was none.

Juror testimony "concerning the subjective mental processes of jurors, such as the reasons for their decisions," is not permitted. *Commonwealth* v. *Fidler*, 377 Mass. 192, 198 (1979).

*Judgments affirmed.*