COMMONWEALTH *vs.* LUGENE KENDRICK.

No. 87-300.

Essex.   October 23, 1987. — May 17, 1988.

Present: ARMSTRONG, PERRETTA, & FINE, JJ.

Further appellate review granted, 402.Mass. 1104 (1988).

*Practice, Criminal,* Fair trial, Examination of jurors, Venue, Newspaper
article, Judicial discretion.

At a criminal trial, where the defendant had demonstrated there was a sub-
stantial risk that extraneous issues might influence the jury on account
of the publication during the month before trial of numerous local news-
paper articles unfavorable to the defendant, the judge erred in not granting
at least one of the defendant's several motions seeking amelioration of
the potential harm from the pretrial publicity. [54-55]

INDICTMENT found and returned in the Superior Court De-
partment on April 9, 1986.

The case was tried before *John T. Ronan,* J.

*Eric Brandt,* Committee for Public Counsel Services, for
the defendant.

*Elin H. Graydon,* Assistant District Attorney, for the Com-
monwealth.

PERRETTA, J. At his trial in July, 1986, on an indictment
charging him with possession of cocaine with the intent to
distribute that substance in July, 1985, the defendant advanced
a theory of defense that the Commonwealth's case was one of
mistaken identity. It appears that immediately upon graduating
from the police academy, the identifying officer was assigned
to an undercover narcotics investigation being conducted in
four areas of Lynn, one of which was Mall Street. Within a
short time span, the officer made about seventy-five drug pur-
chases from some thirty different people, including the defend-
ant. After his purchase from the defendant, the officer was
unable to select the defendant's picture from a photographic

array. Two months later, the officer saw the defendant, who commented to him about the quality of the earlier purchased cocaine. The officer returned to the police station and selected the defendant's picture from a second array. The sole issue on appeal is whether the defendant was deprived of a fair trial by reason of pretrial publicity. We conclude that the defendant laid a sufficient preliminary foundation to warrant at least one of the remedial measures that he requested. As the judge denied all those requests, we reverse the conviction.

1. *The Publicity.*

On April 9, 1986, the grand jury returned the present indictment, and the matter was scheduled for trial on July 11, 1986. Three days prior to trial, the defendant sought a change of venue by motion in which it was alleged that "publicity in Essex County newspapers concerning the details of this case, details of his subsequent arrest on new charges, detailed articles concerning the defendant's family, its history and activities in Lynn" would impair the fairness of his trial which was to be held in Newburyport. Copies of numerous newspaper articles were attached to the motion. The articles had appeared in newspapers which had been published or circulated, or both, in Essex County between June 16 and June 29, 1986. The captions were in dark, boldface print and were worded, as would be expected, to catch the reader's eye. Although a hint of humor might be found in the captions, the articles themselves paint a damaging picture of the defendant.

a. *"Dog doesn't bite, but suspect does."* On June 16, a Lynn newspaper, the Daily Evening Item (Lynn Item), reported that ten police officers went to the 23 Mall Street apartment of the defendant (identified by name) to arrest him for armed robbery. When the police tried to arrest the defendant in his kitchen, a struggle ensued. Two of the officers and the defendant were on the floor scuffling when someone sent a pit bulldog into the kitchen to assist the defendant. When the dog declined to get involved in the melee, the defendant bit the two officers, who thereafter sought medical treatment.

b. *"Suspect bit' em, claim two cops. Pit bull stands by during affray."* This article appeared in the Lynn Item the next day.

It again described the fight in the kitchen and went on to describe the defendant's conduct at his arraignment on the armed robbery charges, to which charges of assaulting a police officer had been added. The reader of this article was informed that the defendant, while restrained in the prisoners' dock, became disruptive and destructive. He disputed his record of defaults, insisting that he was being confused with his brother. As reported in this article, "court sources" stated that the "Kendricks [*sic*] brothers frequently manage to upset court proceedings by concealing their true identities and posing as one another."

It was further noted in the article that the defendant's Mall Street address was "home to an estimated 10 pit bulls," some of which "belong to the Kendrick family." Earlier that month, one of the ten dogs had been "seized . . . for allegedly mauling a Lynn mailman," and a second "was confiscated . . . a few days later."[1]

c. *"Pit bull owner accused of biting two Lynn policemen."* On June 18, the Peabody Times picked up the account of the defendant's fight with the police and the pit bull's failure to render assistance. This article explained that "[p]it bulls historically have been bred as killers and animal experts say a person never knows when the dog will attack."[2]

d. *"Evidence of pit bull fighting found. Mall Street families evicted."* On June 28, the Lynn Item reported that four families were evicted from 23 Mall Street for failure to pay rent. Although the defendant's name did not appear in this article a reader of the previous articles reasonably could suspect a connection between the article and the defendant. As related in this account, those responsible for the eviction process were accompanied to the premises by a "special tactical weapons team clad in black fatigues." Once on the premises, the team

---

[1] The Boston Herald published this same story on June 17 under the caption "'Man bites police' and pit bull stays out of it." Although the article carried the defendant's name and address, the story devoted most of its space to the "vicious" nature of pit bulldogs, the problem with pit bulls in Lynn, and the mauling of the mailman.

[2] This article also appeared in the Newburyport Daily News on June 18.

discovered a pit bull fighting arena, dog stalls, and a number of sick and bruised pit bulls.

If there is any notion that the defendant's unfavorable public image would fade prior to his trial in the instant case, we come forward to June 29 and that week's edition of the North Shore Sunday, a paper having a circulation of 110,000. A photograph of the Kendrick family (not in its entirety) appears on the front page under the following caption:

e. "'*The Worst Family in Lynn.*'" To the immediate right of the caption and in smaller print, appears: "That's what city officials call the Kendricks. 'I don't know what's worse, them or the pit bulls,' says one."

Directly beneath the photograph, the family's four-page saga opens with: "The veteran Lynn cop mulled over many years of experience with the notorious Kendrick family, then concluded, 'They're not a family, they're a crime wave.'"

As the article spreads over the pages, there are other captions (such as "The family that nobody wants") and photographs. The defendant appears in one entitled "Hanging Out On Mall Street." Under this picture, the article reports that "[b]oth neighbors and police blame the Kendricks for most of the problems — from noise to drug dealing — in the neighborhood."

There are about twenty-seven family members, and most of them live in Lynn. The article describes a wide range of social services and assistance given to the various family members. There is an inset captioned "The people who tried to help." It appears that a Lynn Redevelopment Authority employee and a member of the Council of Churches, and perhaps others, were interviewed for the article. In any event, we learn from the inset that housing placements for the Kendrick family met with neighborhood resistance. In one instance, a house designated for the family burned down before they could move into it. As reported in the article, a "widely accepted story is that neighbors torched it to keep the Kendricks away." Another placement met with similar consequences. After the Kendrick family moved into their appointed house, it too burned down. The family dog was "shot dead in the middle of the street and the doors had been nailed shut from the outside."

Twelve family members, including the defendant, were the subjects of individual biographical sketches, short paragraphs detailing criminal records, divorces, number of children receiving assistance, arrest records, etc. The defendant's biographical sketch is not as impressive as some of the others. However, prior to the individual histories and near the picture of the defendant "hanging out on Mall Street," it is stated that the defendant has a record of twenty-six arrests, that the Mall Street area near the defendant's residence "was like a McDonald's drive-thru for drug buyers last summer [1985]," and that "[s]everal Kendricks . . . were arrested on drug charges after a raid at 23 Mall St. late in the summer."

2. *Requests for Relief from Prejudicial Publicity.*

The indictment charging the defendant with the unlawful distribution of cocaine was returned, as previously mentioned, on April 9, 1986. Throughout April, May, and June, 1986, various motions were filed, heard, and ruled upon. Trial was set for July 14. On July 8, defense counsel filed a motion for change of venue and attached the articles to the motion.

At the hearing on the motion on July 10, defense counsel pointed to the content and extent of the publicity, noting that the defendant's first name was one which "could very definitely stick out in a person's mind," that the jury pool consisted of people "from the entire county," and that the defendant even had merited mention on Paul Harvey's national radio broadcast news show. Viewing the articles as focused more on pit bulls than on the defendant, and being skeptical that the publicity "got to Newburyport," where the trial was to be held, the judge denied the motion.

When the case was called for trial the next day (July 11), defense counsel filed a motion to exclude from the jury pool "all persons living in the greater Lynn area." That motion was also denied.

Next came a motion to propound questions individually to prospective jurors. Of the nine requested questions, only one is here pertinent. It reads: "Do you read any, or all of the following newspapers on a regular basis: North Shore Sunday; The Lynn Item; The Peabody Times; The Newburyport News;

The Boston Herald. Have you seen articles or columns regarding the defendant and or his family?" The judge announced that he would make inquiry of the jurors, collectively, "in some of these matters" but that he would not use the "precise language" requested by the defendant. Two questions which reasonably could be viewed as related to the publicity problem, albeit in an oblique and limited manner, were put to the prospective jurors: (1) "[W]hether or not, from any source whatsoever, be it a newspaper, at work, over the radio, at some social gathering, from any source whatsoever, do any one of you have any prior knowledge of *this particular matter* [emphasis supplied]"? (2) "[H]ave any one of you ever formed any opinion with respect to the innocence or with respect to the guilt of this particular defendant?" None of the jurors responded to either of the questions.

In response to the defendant's objection to his refusal to tie the first question directly to any knowledge from "papers or any other media," the judge explained that, in his view, to do so would only focus attention upon the articles. Defense counsel argued that her formulation of the question presented a fair way to begin delving into the issue. The judge stood by his ruling.

A jury was empanelled and sworn, and the indictment read to them. The prosecutor made her opening statement, setting the scene of the cocaine sale at 23 Mall Street, Lynn. She described that area as a "hot spot, so to speak."[3]

On the next day, just as trial was to resume, the jury forelady asked to speak with the judge. She told the judge that when she "heard more closely the defendant's name Lugene Kendrick," she remembered having read the name in an article about the "worst family in Lynn." In response to the judge's questions, the forelady stated that she had said nothing to the other jurors and that the matter had not come up among them. Because she believed that the article would interfere with her duty to decide the case solely on the basis of the evidence presented, the judge excused her from the jury. The defendant requested a mistrial, and the judge denied the motion.

---

[3] We suggest no impropriety in these statements.

Commonwealth *v.* Kendrick.

3. *Discussion.*

It is the defendant's burden to establish that he was denied a fair trial by reason of pretrial publicity. See *Commonwealth* v. *Nolin,* 373 Mass. 45, 49 (1977), and cases therein cited. We see no need to discuss the established principles of law concerning such publicity. See generally *Irvin* v. *Dowd,* 366 U.S. 717, 722-723 (1961); *Commonwealth* v. *Estremera,* 383 Mass. 382, 391 (1981); *Commonwealth* v. *Sielicki,* 391 Mass. 377, 379-381 (1984); *Commonwealth* v. *Jackson,* 391 Mass. 749, 755-757 (1984); *Commonwealth* v. *Burden,* 15 Mass. App. Ct. 666, 671-672 (1983). Nor do we think it necessary to analyze whether the articles were adverse, damaging, or otherwise prejudicial to the defendant. The timing (see *Commonwealth* v. *Geagan,* 339 Mass. 487, 501 [1959]; *Commonwealth* v. *Scott,* 360 Mass. 695, 696-697 [1971]; *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 532 [1975]; *Commonwealth* v. *Sielecki,* 391 Mass. at 379-380) and the content (*Commonwealth* v. *Balakin,* 356 Mass. 547, 554 [1969]; *Commonwealth* v. *Cameron,* 385 Mass. 660, 668 [1982]; *Commonwealth* v. *Sielecki,* 391 Mass. at 379) of the articles provided an ample basis to alert the judge that there was a substantial risk that the case might be decided on extraneous grounds.[4] See *Commonwealth* v. *Crehan,* 345 Mass. 609, 612-613 (1963). Further, the defendant did all that could be expected and required of him to raise the issue, to ameliorate the potential harm, and to save his rights. See *ibid.; Commonwealth* v. *Burden,* 15 Mass. App. Ct. at 671-672. See also Smith, Criminal Practice and Procedure §§ 2359, 2360, 2363, 2364, 2367, & 2368 (2d ed. 1983).

Even if in viewing each of the judge's rulings in isolation it cannot be concluded that he abused his discretion in denying the defendant's motion for a change of venue (see *Common-*

---

[4] As the confidential juror questionnaires have been destroyed (see G. L. c. 234A, § 23), we do not know the cities and towns in Essex County from which the seated jurors came. However, we do know that the articles were featured prominently in newspapers having a circulation primarily, if not exclusively, in Essex County and that at least one juror had read the most disparaging of the stories.

*wealth* v. *Bianco*, 388 Mass. 358, 367-368 [1983]; *Commonwealth* v. *Burden*, 15 Mass. App. Ct. at 672), or in refusing to question the jurors more directly and specifically about the publicity (see *Commonwealth* v. *Carita*, 356 Mass. 132, 143 [1969]; *Commonwealth* v. *Jackson*, 376 Mass. 790, 798 [1978]), or in refusing to make inquiry of the jurors under G. L. c. 234, § 28, second par., either prior to their being sworn or after his conversation with the forelady (see *Commonwealth* v. *Gilday*, 367 Mass. 474, 491-492 [1975]; *Commonwealth* v. *Jackson*, 376 Mass. at 800 & n.5), it was error to deny all the defendant's motions. Compare *Commonwealth* v. *Jones*, 9 Mass. App. Ct. 103, 112-116 (1980); *S.C.* 382 Mass. 387 (1981); *Commonwealth* v. *Hennessey*, 17 Mass. App. Ct. 160, 165-167 (1983), where there was no showing of any substantial risk that extraneous issues would influence the jury. Some form of action was required here to assure that the defendant's guilt or lack of it would be determined by a fair trial. As none was taken, the conviction cannot stand.

*Judgment reversed.*

*Verdict set aside.*