COMMONWEALTH vs. LUGENE KENDRICK.

Essex. October 7, 1988. — March 13, 1989.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal*, Fair trial, Examination of jurors, Venue, Newspaper article, Mistrial, Judicial discretion.

At a criminal trial in which the defendant raised the issue of prejudicial pretrial publicity, the judge's questions to the collective venire were adequate to ensure a fair trial, and the defendant was not entitled to a change of venue or the exclusion from the jury of all persons living in a certain geographic area. [302-304]

There was no merit to a criminal defendant's contention that his motion for a mistrial should have been granted after the foreperson, on the second day of trial, informed the judge in chambers that she remembered reading a newspaper article about the defendant and no longer felt she could be impartial, where the judge excused the foreperson, after assuring himself that she had not spoken with other jurors about the article, before proceeding with the trial. [304]

INDICTMENT found and returned in the Superior Court Department on April 9, 1986.

The case was tried before *John T. Ronan*, J.

After review by the Appeals Court the Supreme Judicial Court granted leave to obtain further appellate review.

*Eric Brandt*, Committee for Public Counsel Services, for the defendant.

*Elin H. Graydon*, Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. A jury convicted the defendant of possessing cocaine with intent to distribute it. The Appeals Court reversed the conviction. 26 Mass. App. Ct. 48 (1988). We granted the Commonwealth's application for further appellate review. We now affirm the conviction by a majority of the court.

The only issue that was before the Appeals Court and is now before us is whether the defendant was deprived of a fair trial by pretrial publicity. His defense at trial, which was conducted in Newburyport in Essex County, was that he had been mistakenly identified. Shortly before trial, which was scheduled to begin on July 11, 1986, the defendant moved for a change of venue on the ground that Essex County newspapers had publicized details of the case, details of the defendant's arrest on other charges, and detailed unfavorable articles about his family. We describe below the publicity on which the motion was grounded. A somewhat more extensive description is contained in the Appeals Court's opinion. 26 Mass. App. Ct. at 48-51.

On June 16, 1986, a Lynn newspaper, the Daily Evening Item (Lynn Item), reported that ten police officers had gone to the defendant's home to arrest him for armed robbery. When someone sent a pit bull to the defendant's rescue, according to the article, the dog declined to become involved. However, the defendant bit two of the officers. On the following day, the Lynn Item reported that the defendant had been arraigned not only on the robbery charge but also on a charge of assaulting a police officer, and that the defendant had been disruptive and destructive while restrained in the prisoner's dock. The article also stated that the defendant had disputed a record of alleged defaults and had claimed that he was being confused with his brother. Also, according to the article, "[c]ourt sources" had revealed that the "brothers frequently manage to upset court proceedings by concealing their true identities and posing as one another."

On June 18, the Lynn Item's June 16 account of the affray involving the police at the defendant's home was substantially repeated in the Peabody Times. Then, on June 28, the Lynn Item revealed that four families had been evicted from the address previously reported as the defendant's address for nonpayment of rent. At that address, the "team" that accompanied the process servers reportedly discovered a pit bull fighting arena and sick and bruised pit bulls. Then, on June 29, a photograph of part of the Kendrick family appeared on the

front page of North Shore Sunday, a newspaper having a circulation of 110,000. The following caption was above the photograph: "The Worst Family in Lynn." To the immediate right of the caption and in smaller print, appeared: "That's what city officials call the Kendricks. 'I don't know what's worse, them or the pit bulls,' says one." Directly beneath the photograph, an article on the family begins with the sentence: "The veteran Lynn cop mulled over many years of experience with the notorious Kendrick family, then concluded, 'They're not a family, they're a crime wave.'" In the course of the article there are additional photographs. The defendant appears in one of them, and under the photograph it is stated: "Both neighbors and police blame the Kendricks for most of the problems — from noise to drug dealing — in the neighborhood." At a point close to the photograph, the article stated that the defendant had a record of twenty-six arrests, and that the area in which the defendant lived "was like a McDonald's drive-thru for drug buyers last summer [1985]," and that "[s]everal Kendricks . . . were arrested on drug charges after a raid at [the building in which the Kendricks resided] late in the summer."

A judge denied the motion for a change of venue. When the case was called for trial, the defendant moved to exclude from the jury pool "all persons living in the Greater Lynn area." The judge also denied that motion. Then the defendant moved that the judge propound several questions to the prospective jurors individually. The proposed questions pertinent to the appeal are: "Do you read any, or all of the following newspapers on a regular basis: North Shore Sunday; The Lynn Item; The Peabody Times; The Newburyport News; The Boston Herald. Have you seen articles or columns regarding the defendant or his family?" The judge announced that he would inquire of the jurors collectively regarding "these matters," but that he would not ask the precise questions the defendant requested.

The judge began the empanelment process by asking the defendant to stand. Then he told the venire that he would ask them some questions in order that the jurors selected would be "absolutely impartial." The judge asked the venire: "Do any of you know, are you related to, are you acquainted with,

do you know the defendant in this case, Lugene Kendrick?"
There was no response.

Next, the judge recited the names of the expected witnesses
and asked if any of the venire knew any of them. One venire
member reported that she knew one of the prosecution witness-
es, a Lynn police officer, and she was excused from service.
Later, the judge announced that he would be inquiring whether
the venire had ever heard anything about this case. In order
for them to respond, he said, he would have to describe the
case to them in its "barest form." He proceeded to do so,
stating that the Commonwealth alleged that "Lugene Kendrick
of Lynn, on the 18th day of July, 1985, not being authorized
by law, did knowingly or intentionally distribute or dispense
a controlled substance, Class B, to wit: cocaine . . . . What
the Commonwealth alleges is that in the City of Lynn, in and
around or about some public street, that Lugene Kendrick on
July 18th of last year sold some cocaine to another person."
The judge then said to the venire: "I give you that accusation
because I want to ask you whether or not, from any source
whatsoever, be it a newspaper, at work, over the radio, at
some social gathering, from any source whatsoever do any
one of you have any prior knowledge of this particular matter?"
There was no response. Then the judge asked: "[H]ave any of
you ever formed any opinion with respect to the innocence or
with respect to the guilt of this particular defendant?" Again,
there was no response.

After instructing the venire on the presumption of innocence
and the Commonwealth's burden of proof, the judge instructed
that the defendant "is entitled to have you decide the case on
the basis of the evidence, and solely upon the basis of the
evidence, that is produced here . . . ." He then put two questions
to the venire. The first was, "So . . . I now ask you whether
any of you, for whatever reason, would not be able to give
this man, one, the presumption of innocence and, two, to hold
to that standard of proof that the law requires before he be
convicted — that is, proof beyond a reasonable doubt." The
second question was, "Any one of you, for any reason what-
soever, for any reason whatsoever, should you be called in this
case and selected as a juror, do any of you know of any reason

why you shouldn't serve?" There was no response to either question.

A jury were empanelled and sworn. The indictment was read to the jury and the prosecutor made an opening statement. On the next day of trial, as the trial was about to resume, the foreperson told the judge in the jury's absence that, when she "heard more closely the defendant's name Lugene Kendrick," she remembered having read the name in an article about the "worst family in Lynn." In response to the judge's questions, she stated that she had said nothing to the other jurors and that the matter had not come up among them. Because she believed that the article would interfere with her duty to decide the case solely on the basis of the evidence presented, the judge excused her from the jury. The defendant requested a mistrial, and the judge denied the motion. The judge explained to the remaining thirteen jurors: "One of the reasons, although a jury is twelve in number, we pick fourteen is that from time to time problems arise and one, as you can see, has arisen because [one juror] is no longer with us. For matters entirely extraneous to the evidence and [having] entirely nothing to do with resolution of the matter before you, [the juror] brought it to my attention and I excused her."

At the trial, when the evidence was complete and counsel had argued to the jury, the judge instructed the jury to "decide this case on the evidence or lack of it . . . on the evidence and solely upon the evidence." He said that the case "like all others, should rise [or] fall on the strength or lack of it of the proofs offered [at the trial]."

On appeal, in which the defendant argued that he had been deprived of a fair trial, the Appeals Court held as follows: "Even if in viewing each of the judge's rulings in isolation it cannot be concluded that he abused his discretion in denying the defendant's motion for a change of venue . . . or in refusing to question the jurors more directly and specifically about the publicity . . . or in refusing to make inquiry of the jurors under G. L. c. 234, § 28, second par., either prior to their being sworn or after his conversation with the fore[person] . . . it was error to deny all the defendant's motions. . . . Some form of action was required here to assure that the defendant's guilt

or lack of it would be determined by a fair trial. As none was taken, the conviction cannot stand." (Citations omitted.) 26 Mass. App. Ct. at 54-55. A majority of the court disagrees.

The second paragraph of G. L. c. 234, § 28 (1986 ed.), provides that a judge must examine prospective jurors fully and individually "if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including . . . possible exposure to potentially prejudicial material . . . the juror may not stand indifferent." The question for the judge is whether "there exists a substantial risk of extraneous influences on the jury." *Commonwealth* v. *Boyer*, 400 Mass. 52, 55 (1987), citing *Commonwealth* v. *Campbell*, 378 Mass. 680, 696 (1979). Unless such a risk is determined to exist, individual questioning is not required and, as we have said repeatedly, that determination is subject to the judge's broad discretion. *Commonwealth* v. *Jackson*, 391 Mass. 749, 756 (1984). *Commonwealth* v. *Cameron*, 385 Mass. 660, 667 (1982), and cases cited.

The judge's questions, put to the venire collectively, did not focus on sensitive matters about which jurors might hesitate to make a public disclosure. See *Commonwealth* v. *Shelley*, 381 Mass. 340, 353 n.12 (1980). Thus, the venire's lack of response to the several questions put to them collectively must be construed as their representations that they were unacquainted with the defendant, that they had no prior knowledge of "these matters" from newspapers or any other source, and that they were unaware of any reason why they would not acquit the defendant unless the Commonwealth proved his guilt beyond a reasonable doubt.

Ordinarily, collective questioning does not inhibit truthful answers. See *Commonwealth* v. *Campbell, supra* at 696-697. Surely, the matters inquired about were not of such a nature as to require the closer scrutiny provided by individual voir dire. Contrast *Commonwealth* v. *Hobbs*, 385 Mass. 863, 873 (1982); *Commonwealth* v. *Sanders*, 383 Mass. 637, 641 (1981). The judge was entitled " 'to accept, without more, the declaration of the jurors as to their disinterest and freedom

from emotional or intellectual commitment.' " *Commonwealth*
v. *Bianco*, 388 Mass. 358, 368, *S.C.*, 390 Mass. 254 (1983),
quoting *Commonwealth* v. *Gilday*, 367 Mass. 474, 492 (1975).

The defendant requested the judge not only to question the
venire individually, but also to inquire as to whether the jurors
customarily read the specific newspapers in which the pretrial
articles appeared, and as to whether the jurors had seen "articles
or columns regarding the defendant or his family." In the
opinion of a majority of the court, the judge wisely declined.
Such specific inquiries could well have created a problem where
there was none. See *Commonwealth* v. *Sinnott*, 399 Mass.
863, 884 n.19 (1987) ("The judge was correct to resist pressure
from trial counsel to inquire of the jurors further, with greater
specificity concerning particular media reports or their content.
Had he bowed to pressure, he would have risked spreading,
by judicial suggestion, the very taint . . . he sought properly
to contain"). See also *Commonwealth* v. *Beneficial Fin. Co.*,
360 Mass. 188, 296 (1971), cert. denied sub nom. *Farrell* v.
*Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin.
Co.* v. *Massachusetts*, 407 U.S. 914 (1972) ("the judge also
might have been reluctant to call the attention of the jurors to
possible sources of adverse publicity"); *Taylor* v. *Creeley*, 257
Mass. 21, 26 (1926).

The judge's questions to the collective venire were adequate
to ensure a fair trial. Clearly, then, the defendant was not
entitled to a change of venue nor was he entitled to the exclusion
from the jury of "all persons living in the Greater Lynn area."

Finally, there is no merit to the contention that the judge
erred in denying the defendant's motion for a mistrial brought
on the second day of trial after the foreperson informed the
judge in his lobby that she remembered reading an article about
the defendant and no longer felt she could be impartial. The
judge acted well within his discretion in excusing the foreperson
and, after assuring himself that she had not spoken with any
other juror about the article she remembered, proceeding with
the trial.

A majority of the court concludes that the defendant has demonstrated no error, abuse of discretion, or unfairness in the conduct of his trial.

*Judgment of the Superior
Court affirmed.*