COMMONWEALTH vs. DUDDIE FORD, INC.

No. 87-1393.

Worcester. October 5, 1989. - March 26, 1990.

Present: BROWN, KAPLAN, & PERRETTA, JJ.

Further appellate review granted, 407 Mass. 1103 (1990).

*Larceny. False Pretenses. Practice, Criminal,* Examination of jurors,
Newspaper article, Instructions to jury, Duplicitous convictions. *Jury
and Jurors. Evidence,* Hearsay, Business record. *Corporation,* Criminal
responsibility. *Agency,* Scope of authority or employment.

The judge at a criminal trial did not abuse his discretion in concluding
that the prospective jurors' responses to his collective questioning re-
vealed no substantial risk that their impartiality was affected by any
extraneous influence, and he was not required, therefore, to question
each of them individually. [428-432]

The judge at a criminal trial, who had previously questioned the jurors in
general terms about their impartiality, did not err in declining to inter-
view the jury panel or grant the defendant other relief after a juror, on
the second day of the trial, reported to him that other jurors had read
about the case in a newspaper prior to the trial. [432-434]

At the trial of larceny indictments, various bank records, even if not tech-
nically within the business records exception to the hearsay rule, were
sufficiently authenticated through the testimony of an officer of the
bank to be admissible for the limited purpose of showing what they
recited and what was on file at the bank at the time certain loans were
approved. [434-435]

In criminal proceedings against the corporate owner of an automobile
dealership arising from a scheme whereby bank loans for the purchase
of automobiles had been obtained by fraudulent means, convictions
under G. L. c. 266, § 34, for larceny by false pretenses were duplicative
of convictions under G. L. c. 266, § 33 (2), for larceny by means of a
false statement in writing to obtain credit. [435-438]

At the trial of indictments under G. L. c. 266, § 33 (2), for making a false
statement in writing to obtain credit, the judge's charge, viewed in its
entirety, correctly described the elements of the crime. [438-439]

Convictions under G. L. c. 266, § 33 (2), for larceny by means of a false
statement in writing to obtain credit from a bank, were warranted by
findings that the defendant caused false information to be included in
customers' loan application forms, which were reduced to writing by
bank employees based on information supplied to them by the defend-
ant [439-440], and that the false statements had materially influenced
the bank to extend credit [440-441].

At the trial of a corporation charged under G. L. c. 266, § 33 (2), with larceny by means of a false statement in writing to obtain credit, the evidence warranted the jury in finding that a certain employee of the corporation was authorized to act for it in its sphere of corporate business, namely, obtaining financing for customers' purchase of automobiles, and that his criminal acts benefited the defendant. [441-442]

INDICTMENTS found and returned in the Superior Court Department on May 7, 1986.

The cases were tried before *William C. O'Neil, Jr.*, J.

*Nancy Gertner (Sharon Beckman* with her) for the defendant.

*Sandra L. Hautanen*, Assistant Attorney General, for the Commonwealth.

BROWN, J. The defendant, Duddie Ford, Inc. (Duddie Ford),[1] was convicted on twelve indictments charging larceny by a false pretense to induce another to part with property in violation of G. L. c. 266, § 34, and on twelve indictments charging larceny by a false statement in writing to obtain credit in violation of G. L. c. 266, § 33.[2] Duddie Ford was sentenced to a $500 fine and $125 surfine on each of the convictions.

The Commonwealth presented evidence that, in 1984, loans for the purchase of automobiles by twelve customers of Duddie Ford had been obtained by fraudulent means from the Watertown branch of the Coolidge Bank & Trust Company (the bank). Maintaining that the financial information[3]

---

[1]Duddie Ford, Inc., a Massachusetts corporation, does business as an automobile dealership in Westborough. As a co-defendant, Thomas Nedder, died on December 30, 1988, his convictions were vacated by this court and the case was remanded to the Superior Court with instructions to dismiss the indictments against him.

[2]After the verdicts were returned, the judge allowed the defendant's motion for a required finding of not guilty on one of the indictments under c. 266, § 34.

[3]These materials included loan applications containing information (for the most part, false) as to the borrowers' income, employment history, and length of residence, the purchase price of the car, W-2 wage and tax statements, 1099 forms and pay stubs.

submitted to the bank for the loans proved the existence of a "scam" with substantial benefit accruing to Duddie Ford, the Commonwealth contended that the defendant Nedder, employed as a salesman by Duddie Ford, obtained automobile loans for customers who were poor credit risks by, among other things, misrepresenting the customers' income, current employment, work history, down payments and trade-ins.[4] Because of inflated price figures supplied to it, the bank issued checks at the loan closings made out jointly to the customers and Duddie Ford in amounts greater than the actual prices of the automobiles financed. The Commonwealth alleged that certain Duddie Ford employees endorsed the checks and made out separate overage checks to the customers for the amounts of the excess. The overage checks were later negotiated (sometimes under forged endorsements), but the customers did not, in most cases, receive any proceeds.

1. *Jury bias.* The defendant claims that the record shows a substantial risk that the jurors were influenced by community bias or pretrial publicity and that the judge abused his discretion by not conducting an individual voir dire as to such influence. See G. L. c. 234, § 28. See also Mass.R.Crim.P. 20(b), 378 Mass. 889 (1979). Secondly, the defendant argues that the judge erred in failing to interview the jury panel or grant some other form of requested relief after one juror, on the second day of trial, reported that other jurors previously had read about the case in a newspaper.

(a) Prior to the empanelment of the jury the defendant moved for an individual voir dire and proposed specific questions to be asked the prospective jurors. The judge declined to conduct an individual voir dire, but requested that defense counsel point out which questions he felt were "essential" to a fair trial. Then, calling for affirmative responses to be indicated by a show of hands, the judge conducted an inquiry of the venire which included the following questions:

---

[4]There was evidence that Duddie Ford advertised that customers should call "Mr. Ned" at the dealership.

"Whether you have expressed any opinion on [the case] or formed any opinion insofar as the matter is concerned . . . ;

"Whether any of you are sensible of any bias or prejudice insofar as this case is concerned, the parties and the issues;

"Whether any of you know of any reason why you cannot or do not stand indifferent. By standing indifferent, I mean you know of any reason why you could not . . . make your decision on the basis of the evidence that you hear and the instructions that would be given to you insofar as the law is concerned;

"[H]ave any of you had any business dealings with Duddie Ford;

. . .

"[W]hether any of you have purchased or shopped for a motor vehicle at the Duddie Ford dealership . . . [T]hose of you who said that you shopped down there, did any of the activities or business relations with Duddie Ford or its salesmen or other employees, result in some unfavorable impression on your part . . . ;

"[W]hether any of you have read or listened to advertisements of Duddie Ford . . . . I think it is likely that a good number of us have at least seen the ads. But I am talking about paying sufficient attention to those ads so that you would read them . . . or . . . hear what was being said on those ads;

"[W]ith all of the information that I have given you here, is there anything that comes to your mind because of what I have told you here or because of the questions that I have asked you, that you feel that you should bring to my attention before we proceed with the empanelment of the case."

The judge then said he would see the prospective jurors who had had any "unfavorable result" from business dealings with the defendant, prospective jurors who had answered affirmatively any of his questions, and anyone "who has some-

thing to tell me that I haven't asked specifically, but you feel you should talk . . . with me before we proceed with the empanelment." After a sidebar conference requested by Duddie Ford's counsel, the judge asked for a show of hands of those jurors "aware of or familiar with" the Duddie Ford dealership, followed by a request for a show of hands of those who were not aware of or familiar with the defendant.[5]

Some confusion then ensued. The judge excused the panel for lunch, except for "those jurors who raised their hands up here . . . [and] [t]hose who want to talk with me or whom I have asked to talk with me."[6] The judge questioned individually those prospective jurors — twenty-five — who remained, and excused fourteen of them, many on the basis of their previous business dealings with Duddie Ford or their unfavorable opinion of the dealership. He denied Duddie Ford's motion for a change of venue and its renewed request for an individual voir dire, stating that "when you take the nature of the questions that I have asked them, I gave them plenty of opportunity to come up to say what they knew, how they felt, or what it is that gave them a bad taste in their mouth, or some such thing as that." He also observed that he felt he had gone "to great pains in putting questions to [the prospective jurors] that would invite an opportunity for them to voice in a case that they heard was going to go for two weeks, some reason that would disqualify them as disinterested jurors."

The next day, prior to opening statements of counsel, two of the empanelled jurors came forward in response to the judge's questions of the previous day about knowing the parties or witnesses. The judge questioned these jurors individu-

---

[5]The first of these two questions received such a large response that the judge put the second question, observing that the response might "be easier to count." Defense counsel, who was seeking a change of venue, might have expected that many of the venire would be familiar with the Duddie Ford dealership.

[6]It is undisputed that a number of prospective jurors who had responded affirmatively to at least the question whether they were familiar with Duddie Ford left the courtroom at this time and were not questioned subsequently.

ally; one of them was challenged. In order to augment the jury, a second venire was brought in, and the judge repeated essentially the same questioning procedure that he had used with the first venire. This time all the prospective jurors indicated that they had heard of Duddie Ford. The judge questioned and excused three of the prospective jurors. Duddie Ford's request for a more extensive individual voir dire was again denied. Three more jurors were then empanelled, none of whom had been questioned individually about possible bias. Duddie Ford exhausted its peremptory challenges, as it had with respect to the first venire.

The key inquiry is whether, as Duddie Ford contends, the prospective jurors' responses to the group questions established that there was a substantial risk that juror impartiality was affected by extraneous influences, thereby necessitating a full individual examination. G. L. c. 234, § 28. Unless the trial judge first determines that such a risk exists, individual questioning of the prospective jurors is not required; the threshold determination is subject to the judge's broad discretion. See *Commonwealth v. Shelley*, 381 Mass. 340, 352 (1980); *Commonwealth v. Hobbs*, 385 Mass. 863, 873 (1982); *Commonwealth v. Sheline*, 391 Mass. 279, 290-291 (1984); *Commonwealth v. De La Cruz*, 405 Mass. 269, 273-274 (1989); *Commonwealth v. Mahoney*, 406 Mass. 843, 851 (1990); *Commonwealth v. Kendrick*, 26 Mass. App. Ct. 48 (1988), *S.C.*, 404 Mass. 298, 303 (1989). See also *Commonwealth v. Brown*, 386 Mass. 17, 30 (1983). Here, the judge concluded that there was not such a risk. Although the voir dire could have been conducted more smoothly, we do not think the judge abused his discretion in refusing to question all of the prospective jurors individually.

Despite the fact that Duddie Ford was a well known enterprise in Worcester County, the judge could rightly determine that individual questioning of every prospective juror was not necessary. See *Commonwealth v. Kendrick*, 404 Mass. at 303-304. Indeed, many of the prospective jurors indicated that they had heard of Duddie Ford, and the judge could properly take their failure to come forward for individual

questioning, after his initial specific questions to them, as a representation that they could sit impartially. "The judge was entitled to 'accept, without more, the declaration of the jurors as to their disinterest and freedom from emotional and intellectual commitment.'" *Ibid*. (citations omitted). See also *Commonwealth* v. *Ascolillo*, 405 Mass. 456, 460 (1989).

The mere fact that many of the prospective jurors had heard of or read about Duddie Ford is insufficient in itself to show a substantial risk of prejudice. See *Commonwealth* v. *Jackson*, 391 Mass. 749, 755-756 (1984). "Jurors need not be absolutely ignorant of the facts and issues involved in a case to be able to make an impartial judgment." *Id*. at 755, citing *Dobbert* v. *Florida*, 432 U.S. 282, 302-303 (1977). The thrust of all the questions the judge did ask of the prospective jurors collectively was designed to flush out any juror who could not be impartial, and after questioning the venire as a group about any bias, interest or other influence upon the prospective jurors' impartiality, the judge individually questioned anyone who came forward. In the circumstances, there was no abuse of discretion.

(b) The defendant also argues that the judge committed reversible error by not interviewing the jury panel or granting some other form of relief after one juror reported that other jurors had read about the case in newspapers. On the second day of trial, one juror came forward to say she had seen a program on television about the case, and that now "it all came back to me." The juror also stated that she had asked the other jurors about it and that none of the other jurors had seen anything on television, but "they [had] read things in the paper, you know, previously." Duddie Ford's motions for a mistrial and a change of venue were denied.

If the trial judge determines that a serious question of possible prejudice has arisen because members of an empanelled jury have been exposed to potentially extraneous material about the case during the trial, a voir dire examination of the jurors should be conducted. "The initial questioning . . . may be carried on collectively, but if any juror indicates that he or she has seen or heard the [potentially prejudicial]

material, there must be individual questioning of that juror. . . ." *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978). The judge in this situation must again make a threshold determination whether there has been raised "a serious question of possible prejudice." *Ibid.* In claims involving pretrial publicity the " 'dominant consideration . . . is not the views to which the jurors have been exposed; it is what is their commitment, if any, in their own opinions, or their own expressions.' " *Commonwealth* v. *Jackson*, 391 Mass. at 755-756, quoting from *Commonwealth* v. *Subilosky*, 352 Mass. 153, 158-159 (1967). Here, the judge concluded that the pretrial publicity would not affect the jurors if they said it would not when originally questioned by him. In effect, the judge concluded that he had already sufficiently questioned the jurors as to their impartiality, in general terms, and that there was no further need to question them specifically about pretrial publicity.

Moreover, it may have been the better decision that the judge did not inquire whether the jurors had seen or heard anything about the Duddie Ford case in the media. "Such specific inquires could well have created a problem where there was none." *Commonwealth* v. *Kendrick*, 404 Mass. at 304, and cases cited.[7] The judge had instructed the jury, after they were empanelled, to avoid talking and reading about the case. He excused the one juror who came forward to say that she had seen a television program and felt that it might affect her impartiality. He saw no reason to inquire further as to whether the other jurors had been exposed to outside information about the case. The juror who came forward stated that the other jurors had read about Duddie Ford prior to, and not during, the trial. "There is no indication in the totality of the circumstances that the defendant was de-

---

[7]The judge may have determined, as the Commonwealth had pointed out prior to jury empanelment, that a specific question about any media publicity would have had the adverse effect of calling the jurors' attention to possible sources of adverse publicity. *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 296 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972).

nied a fair trial because of pretrial publicity." *Commonwealth* v. *Jackson*, 391 Mass. at 756.

2. *Evidentiary matters*. The defendant's second claim of error is that highly prejudicial documentary materials were improperly admitted in evidence. Specifically, Duddie Ford argues that it was reversible error to admit the customers' loan applications and income verification documents because they had not been properly authenticated. Citing *Irwin* v. *Ware*, 392 Mass. 745, 749-751 (1984), the defendant contends that the documents had to be introduced by someone who had personal knowledge of their creation and could establish their chain of custody; because that was not done, the documents were "inadmissible on materiality or relevance grounds." *Id.* at 750.

The documents were introduced through the testimony of the bank's vice president, Wayne Cady, who was designated for the purposes of the trial as the keeper of the records. The defendant objected to their admission, claiming that the business records statute, G. L. c. 233, § 78, was not applicable to the documents because (a) they were not being admitted for their truth, and (b) the requirements of the statute were not satisfied.[8] The defendant further argues that the statute does not provide an independent method of authentication when records are not offered for the truth of what they recite and that Cady could not otherwise authenticate them. See Liacos, Massachusetts Evidence 375-377 (5th ed. 1981).

The judge made a finding that the loan applications and income verification documents qualified as business records, but because of what he perceived as a "totem pole hearsay"

---

[8]The sources of a preparer of a business record "must carry the same indicia of reliability, arising from regularity and business motives, that bring his own act of recording the information within the statutory exception." *Irwin* v. *Ware*, 392 Mass. at 749.

Under G. L. c. 233, § 78, the so-called business records statute, as a condition precedent to the admission of the documents the court must find that the entry or record was made "in good faith in the regular course of business and before the beginning of the civil or criminal proceeding" in which offered. These requirements look to the reliability of the offered records.

problem[9] ruled that they could be admitted "for the limited purpose of showing what [was] on file at the Coolidge Bank & Trust Company" and "what the [documents] recite[d] . . . not for the truth or falsity of what [was] in [them]." Therefore, even if the documents were not technically within the business records exception and could not be admitted for the truth of the facts they contained, the issue presented here is whether the documents were sufficiently authenticated to be admissible for the limited purpose of showing what they recited and what was on file at the bank at the time the loans in question were approved.

Generally, for documents (including business records) to be admissible, regardless of the purpose for which they are being offered, they must be identified, shown to be relevant, and authenticated by a witness who is familiar with them. Here, the manner of authentication was sufficient to provide the necessary indicia of genuineness. Taken as a whole, the sworn testimony of Cady, an officer of the bank, was sufficient to authenticate the documents. He produced the original files, stated that they came from the bank, and testified that such documents were factors generally used in the banking industry to establish the ability of borrowers to repay loans. See *Kaufman v. Kaitz*, 325 Mass 149, 151 (1949). He also was the keeper of the records, or was at least authorized to appear on the custodian's behalf. Thus, the documents were sufficiently authenticated to be admitted to show what was on record at the bank.[10]

3. *Duplicitous convictions.* Duddie Ford contends that its convictions and sentences under G. L. c. 266, § 34, must be

---

[9]The judge denominated the problem as one of "totem pole hearsay," i.e., the documents prepared by the bank (loan applications) were created by a third party with information supplied by the customers, and the bank "received" the income verification documents (e.g., W-2 Statements and 1099 Forms) and placed them in the individual customers' folders. See *Wingate v. Emery Air Freight Corp.*, 385 Mass. 402, 410 (1982) (Liacos, J., concurring).

[10]See Proposed Mass.R.Evid. 901 (a) (authentication requirement is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims). See also Proposed Mass.R.Evid. 902 (10) and the Advisory Committee Notes thereto.

vacated and the indictments dismissed because the convictions under G. L. c. 266, § 34, and G. L. c. 266, § 33(2), are duplicitous.[11] It argues that § 34 does not require proof of an additional fact not required by § 33(2), and that any conduct that violates § 33(2) is necessarily encompassed within the elements of § 34 as well. In essence, the argument is that a § 34 violation is a lesser-included offense of § 33(2), although the punishment for violation of either is the same. See *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306-307 (1972).

On its face, § 33(2) demonstrates the necessity, to support a conviction, of proof of several facts that are not required for conviction under § 34. The dispositive issue thus becomes whether a conviction under § 34 "requires proof of an additional fact which [§ 33(2)] does not." *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871). The Commonwealth relies upon *Commonwealth* v. *Greenberg*, 339 Mass. 557 (1959), wherein the defendants were found guilty of numerous counts of larceny of money from a bank by false pretenses under G. L. c. 266, § 30,[12] and of numerous counts, under G. L. c. 266, § 33, of obtaining credit with intent to defraud by false statements in writing respecting their means and ability to pay. The convictions were based upon the same

---

[11]General Laws c. 266, § 33(2), as inserted by St. 1945, c. 282, § 3, provides: "[W]hoever, with intent to defraud, by a false statement in writing respecting the financial condition, or means or ability to pay, of himself or of any other person, obtains credit from any bank or trust company or any banking institution accustomed to give credit in any form whatsoever, shall be guilty of larceny." Section 33(1), as appearing in St. 1910, c. 378, § 1, and an amendment to § 33(2) by St. 1967, c. 236, are not here material.

General Laws c. 266, § 34, provides: "Whoever, with intent to defraud and by a false pretense, induces another to part with property of any kind or with any of the benefits described in the preceding section shall be guilty of larceny." See St. 1910, c. 378, § 2: "Whoever with intent to defraud and by a false pretense induces another to part with money or a personal chattel or property of any kind or with any of the benefits defined in [the preceding section] shall be guilty of larceny."

[12]General Laws c. 266, § 30(1), as appearing in St. 1945, c. 282, § 2, provides in relevant part: "Whoever . . . with intent to defraud obtains by a false pretense . . . the property of another as defined in this section . . . shall be guilty of larceny . . . ."

series of transactions with the same two banks. 339 Mass. at 561-562. At the close of the evidence the defendants had moved that the Commonwealth be required to proceed under the indictments under one section or the other but not both. After setting forth the relevant statutory provisions, the court concluded that "sections [30 and 33(2)] declare distinct offenses although classified as larcenies. In one it is the theft of property as defined in the statute which is penalized; in the other the fraudulent obtaining of credit." *Id.* at 572. Thus, under *Greenberg*, convictions of larceny of money by false pretenses from a bank and the fraudulent obtaining of credit from the same bank are not duplicitous.

In the present case the Commonwealth did not indict and try the defendant on the larceny of property charge under § 30 but proceeded under § 34. The Commonwealth argues that § 34 requires proof that the defendant by false pretenses effectuated the parting of the owner from his "property", while section 33(2) does not.[13] The defendant argues that the reference within § 34 to prohibited conduct respecting "any of the benefits described in the preceding section [33]" requires the conclusion that convictions under both sections would not satisfy the *Morey* test. It is true that a defendant can be convicted of larceny of property (money) of a bank by false pretenses in addition to the fraudulent obtaining of credit as a result of the same conduct. But the appropriate statute is not G. L. c. 266, § 34,[14] for if a defendant can be convicted, under § 34, of larceny for inducing another to part with "any of the benefits described in" § 33, there is no addi-

---

[13]We are mindful, however, that G. L. c. 266, § 30(2), does define property, inter alia, as "any valuable contract in force."

[14]Sections 1 and 2 of St. 1910, c. 378, were predecessors of sections 33(1) and 34 of G. L. c. 266. See note 11, supra. In 1943, a special Legislative commission, created for the purpose of studying the criminal laws of the Commonwealth and drafting a penal code, recommended a revision of the larceny statute and elimination of its "overlapping and superfluous matters." House Report No. 1462 (1943). In 1945 the Legislature amended G. L. c. 266, § 30, by, inter alia, adding subsection (2), a comprehensive definition of property, and amended G. L. c. 266, § 33, by adding subsection (2). St. 1945, c. 282, §§ 1-3. Section 34 was not amended.

tional element necessary for a conviction under § 34 not re-
quired by § 33.[15] Consequently, the distinction between the
fraudulent obtaining of credit and the fraudulent obtaining
of property by false pretenses can be drawn, if at all, by
G. L. c. 266, § 30, not G. L. c. 266, § 34. Unlike § 34, § 30
contains no reference to § 33 in defining the res necessary for
the crime of larceny. See *Commonwealth v. Greenberg*, 339
Mass. at 572. In the instant circumstances the indictments
for larceny of property by false pretenses should not have
been laid under § 34, if the Commonwealth wished to bring
the convictions within the purview of the *Greenberg* case. As
we have concluded that the convictions under G. L. c. 266,
§ 34, are duplicitous, the sentences imposed thereon must be
vacated, and those indictments are to be dismissed.

Deciding as we do, it is unnecessary to reach Duddie
Ford's other argument that even if its convictions under
§ 33(2) and § 34 are not duplicitous, in order to be con-
victed under § 34, the Commonwealth must establish that
the false pretense was "in writing and . . . signed by the
[party] to be charged." G. L. c. 266, § 35.[16] See in this re-
gard, *Commonwealth v. Stovall*, 22 Mass. App. Ct. 737, 742
(1986). Nor do we need to discuss the defendant's contention
that the judge's instructions authorized convictions under
§ 34 without requiring proof of any fact that was not also
essential to the convictions under § 33(2).

4. *Jury instructions.* Duddie Ford's next argument is that
G. L. c. 266, § 33(2), expressly requires proof of a false
statement in writing and that the judge in his instructions
omitted the requirement from his definition of the essential
elements of § 33(2), thereby precluding the jury from mak-

---

[15]As the defendant notes, the language of § 34 suggests that a defend-
ant's conviction under that section can be based on the larceny of credit.
Compare *Commonwealth v. Anolik*, 27 Mass App. Ct. 701, 712 (1989).

[16]General Laws c. 266, § 35, provides: "Sections thirty, thirty-one and
thirty-four shall not apply to a purchase of property by means of a false
pretence relative to the purchaser's means or ability to pay, if, by the
terms of the purchase, payment therefor is not to be made upon or before
the delivery of the property purchased, unless such pretence is made in
writing and is signed by the person to be charged."

ing the constitutionally required finding of the existence of every element of the crime. Citing *In re Winship*, 397 U.S. 358 (1970), the defendant asserts that the error was so prejudicial that the judgments under § 33(2) must be reversed. The defendant's argument is off the mark.[17]

Immediately before listing the elements of § 33(2), the judge instructed the jury that the crime required "an instrument in writing tending to establish the trustworthiness of a person that was false." The judge did not, however, include that requirement when he stated "the essential elements" of the crime. The instructions were not constitutionally deficient. Viewing the charge as a whole,[18] we conclude that the judge clearly and correctly imparted that a conviction under G. L. c. 266, § 33(2), required the fraudulent obtaining of credit "by a false statement in writing."

5. *Evidence of false statement in writing.* Duddie Ford also argues that on two of the indictments under c. 266, § 33(2), the Commonwealth introduced no evidence of a false statement in writing, and that, on three other indictments under the same provision of the statute, the customers gave no testimony regarding the source of the loan documents. The Commonwealth asserts that it showed Duddie Ford "caused" false information to be included in the customers' loan application forms which were reduced to writing by bank employees based upon information supplied to them by the defendant, and that that is sufficient to satisfy the false statement in writing requirement of § 33(2). We agree.

---

[17]As we are unable to discern any prejudicial error in the judge's instructions, we pass the question whether the defendant properly preserved its right for appellate review. See Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979). See also in this regard, *Commonwealth* v. *Fazzino*, 27 Mass. App. Ct. 485, 488 (1989).

[18]The " 'legal sufficiency of the instructions to the jury is to be judged on the basis of the charge as a whole, and not on the basis of limited or isolated portions of it.' " *Commonwealth* v. *Albert*, 391 Mass. 853, 858 (1984), quoting from *Commonwealth* v. *Redmond*, 357 Mass. 333, 342 (1970). See *Commonwealth* v. *Pinnick*, 354 Mass. 13, 15 (1968); *Commonwealth* v. *Morse*, 402 Mass. 735, 738 (1988). See generally Smith, Criminal Practice and Procedure § 1881 (2d ed. 1983 & 1989 Supp.).

The express language of § 33(2) does not require proof that the defendant prepared the false statement in writing, but only that credit was obtained "*by* a false statement in writing" (emphasis supplied). Evidence that Duddie Ford caused false statements to be included in the customers' written loan applications was sufficient proof of that essential element of the crime. On all of the indictments under § 33(2), the necessary proof that the documents contained false information was supplied by the live testimony of the customers themselves, all of whom testified that the written documents contained false information, either with respect to the amount of their income or the purchase price of the car, or both. We think that the information contained in the false income verification documents or loan applications of all the customers save one (John Gerard), whether they were prepared by the bank, by Duddie Ford, or by the customers at Nedder's direction, provided a legally sufficient basis for the jury reasonably to infer that the defendant provided or caused to be filed false statements in writing within the meaning of § 33(2). See *Commonwealth v. Sandler*, 368 Mass. 729, 740 (1975). As to John Gerard, the Commonwealth failed to introduce any evidence that Duddie Ford was the source of the false statements, and the judgments regarding the defendant's involvement with that customer must be vacated and the indictments dismissed.

: 6. *Sufficiency of the evidence.* The defendant argues that its motions for required findings of not guilty should have been allowed because the Commonwealth's evidence was legally and factually insufficient to support the convictions.

(a) First, Duddie Ford asserts that there was no proof that the bank actually relied upon the false statements. It argues that the only evidence introduced was Wayne Cady's testimony on "the banking industry practice and custom in relation to the granting of consumer loans," and that that testimony was insufficient to show reliance by the bank. Duddie Ford stresses Cady's lack of personal knowledge of the so-called "Dial-a-Loan" program, and the irregularity of the documents contained in the loan files.

For a conviction of larceny by false pretenses to stand, the false statements " 'need not be the sole or predominating motive that induced the victim to part with his money or property . . . [;] it is enough if [the statements] alone or with other causes materially influenced him to take the particular action. . . .' " *Commonwealth* v. *Edgerly*, 6 Mass App. Ct. 241, 263 (1978), quoting from *National Shawmut Bank* v. *Johnson*, 317 Mass. 485, 490 (1945). Cady, as an officer of the bank, testified that banks customarily rely on information in loan applications in granting loans. Furthermore, common sense dictates, and the jury reasonably could infer from the evidence presented, that the bank relied on the statements contained in the files in deciding whether to grant the loans. The jury properly could conclude that false statements made to the bank and false documents that were submitted "materially influenced" the bank to extend credit to the customers. See *Commonwealth* v. *Edgerly*, 6 Mass. App. Ct. at 263, and cases cited.

(b) Duddie Ford next argues that there is no proof that Nedder acted for the benefit of the corporation and that, consequently, it cannot be held criminally liable for his actions. It makes the additional claim that because Nedder concealed his actions from Duddie Ford there was no evidence from which a rational jury could have concluded that Nedder was motivated by anything other than self-interest. The record indicates otherwise.

"[C]orporate criminal liability is necessarily vicarious." *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 263-264 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub. nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972) (citation omitted). Criminal liability is imposed upon a corporate defendant if "criminal conduct [is] performed for its benefit, by its agent authorized to act for the corporation in relation to the particular sphere of corporate business in which the agent was engaged when the criminal conduct took place." *Commonwealth* v. *L. A. L. Corp.*, 400 Mass. 737, 744 (1987). The focus is "on the authority of the corporate agent in relation to the *particular*

corporate business in which the agent was engaged" (*Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. at 257 [emphasis original]), which, here, was selling cars. Cf. *Wang Laboratories, Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 859 (1986) ("conduct of an agent is within the scope of employment if it is motivated, at least in part, by a purpose to serve the employer").

In the present case the Commonwealth produced ample evidence that Nedder not only was authorized to act for the corporation in its sphere of corporate business (i.e., obtaining financing and selling cars), but the criminal acts performed by him benefited Duddie Ford.[19]

7. *Conclusion.* The judgment on indictment 86-112191 is reversed, the verdict is set aside, and the indictment is to be dismissed. The judgments on the remaining indictments brought under G. L. c. 266, § 33, are affirmed. The judgments on the indictments brought under G. L. c. 266, § 34, are reversed, the verdicts are set aside, and the indictments are to be dismissed.

*So ordered.*

---

[19]Duddie Ford steered customers with poor credit ratings to Nedder. Income was derived from each car the dealership sold. In addition, as already mentioned above, the overage checks (exhibits at trial), some with forged endorsements, were endorsed by Duddie Ford employees other than Nedder.