Greco, J.
Plaintiffs Murdo and Jocelyn MacLeod (the “MacLeods”) brought this action against two corporations, Commonwealth Capital Funding Corporation (“Commonwealth”) and Constitution Financial Group, Inc. (“Constitution”), to recover damages against each defendant for deceit and violation of the Consumer Protection Act, G.L.c. 93A. Commonwealth defaulted. After trial, Constitution was found liable under G.L.c. 93A for single damages in the amount of $3,500.00, plus attorney’s fees of $4,820.53, for a total of $8,320.53. On this Dist./Mun. Cts. R. A. D. A., Rule 8C, appeal, Constitution argues that there was insufficient evidence of any wrongdoing on its part to warrant the trial court’s finding that it violated G.L.c. 93A. In addition, Constitution argues that the court erred in admitting into evidence a letter purporting to connect it with Commonwealth’s enticement of prospective homeowners.
The gist of the MacLeods’ complaint was that they sought to purchase a home in spite of their poor credit history; that they answered a newspaper advertisement by Commonwealth representing that it could find a home and secure financing for consumers in such a situation; that they paid Commonwealth $3,500.00, but were never able to buy a home because they could not qualify for financing; and that Commonwealth failed to return their deposit as agreed. Constitution was a mortgage lender and broker that sublet space to Commonwealth. In determining that Constitution was liable under G.L.c. 93A, the trial court found that Constitution “became entwined in the Commonwealth operation, such that they jointly participated in the processing of the [MacLeods’] mortgage application.” The court also found that “[i]t was unrealistic from the beginning to expect that [Mr. MacLeod] with his poor credit history would end up owning a home with mortgage financing,” but that, nevertheless, “both defendants put [Mr. MacLeod] through a series of what can only be called machinations, relative to [the Macle-ods’] desire to buy a house and obtain mortgage financing.” The gravamen of the offense would thus appear to be that the defendants took the MacLeods’ money without any realistic chance that they could fulfill the advertisement’s promise, and, when the inevitable happened, did not return the MacLeods’ deposit.
1. At the close of the evidence, Constitution was denied time to file requests for rulings of law. It was within the court’s discretion to do so. See Mass. R. Civ. P., Rule 64A(a) (requests for rulings “shall be presented to the court before the *240 beginning of any closing arguments unless special leave is given to present requests later”). Having failed to file either an appropriate request for ruling or a Mass. R. Civ. R, Rule 41(b) (2), motion for involuntary dismissal in a timely manner, Constitution “forfeited any right to appellate consideration of whether the evidence adduced at trial supported the trial court’s findings.” Macone Bros., Inc. v. Strauss, 1997 Mass. App. Div. 95, 96. However,
[w]here, as in the instant case, a trial judge elects to make voluntary written findings of fact not required in a District Court nonjury action, a narrow window of appellate opportunity is created for a party who has failed to preserve his right to appellate review. Consideration may be given on appeal to the question whether the trial court’s findings of fact are so devoid of support that they are ‘clearly erroneous.’
Mark Moore Homes, Inc. v. Tarvezian, 1998 Mass. App. Div. 171, 172. See also Mass. R. Civ. P., Rule 52(c). Upon review, the trial judge’s findings are accorded the customary appellate deference in recognition of the trial judge’s superior position to assess the weight and credibility of the evidence. Starr v. Fordham, 420 Mass. 178, 186 (1995). “If the trial judge makes one of several possible choices of what facts are supported by the evidence, the judge’s choice is not clearly erroneous.” W. Oliver Tripp Co. v. American Hoechst Corp., 34 Mass. App. Ct. 744, 751 (1993). The trial judge may disbelieve even uncontroverted testimony. Calderone v. Wright, 360 Mass. 174, 176 (1971). Thus the burden on Constitution is indeed a heavy one. The findings of the trial judge will be disturbed only if “on the entire evidence,” we are “left with the definite and firm conviction that a mistake has been committed.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 509 (1997); Rood v. Newberg, 48 Mass. App. Ct. 185, 191 (1999).
In arguing that the trial court’s findings were clearly erroneous, Constitution aptly points out that on any view of the evidence, the two corporations were separate entities. As noted, Constitution was a mortgage lender and broker. It leased 14,000 square feet of space in the Schraft Center in Boston, and sublet only 600 square feet of that to Commonwealth. Commonwealth maintained a separate office in that space. Each corporation had separate telephone lines, and there was no intermingling of corporate positions. The MacLeods initially met, at their home, with representatives of Commonwealth. Commonwealth purportedly found them the condominium they wished to purchase. It was only subsequent to these events that they were referred to an employee of Constitution, Maureen Perry (“Perry”), to arrange financing. Since the MacLeods’ application for a mortgage was ultimately rejected, Constitution never received any compensation for its efforts on their behalf. As the trial court found, once the financing fell through, “Commonwealth retained the [MacLeods’] $3,500 and undertook a pattern to put off and evade [Mr. MacLeod]” when he sought return of his deposit pursuant to the agreement. Commonwealth eventually stopped doing business in Massachusetts.
However, there was also evidence, as the trial court expressly found, that Perry “accepted direction and orders from Commonwealth,” that there was regular contact between the employees of both corporations in the loan application procedure, and that Commonwealth used Constitution’s printed forms in their dealings with the Macleods. Moreover, there was further evidence that would have permitted the trial court to find the following: that Perry had extensive dealings with the MacLeods; that she processed their application even though she was not presented with a signed purchase and sale agreement; that while Commonwealth maintained a separate office within Constitution’s space, it was not clearly identified as such; that Constitution had received several other referrals from Commonwealth; that because of those referrals and other information received by Perry *241 concerning Commonwealth’s questionable business practices, Constitution was on notice of potential consumer fraud, and continued to do business with it; and that Constitution’s president appears to have actively identified his corporation with Commonwealth’s overly optimistic appeal to potential home buyers (although the admissibility of this evidence will be discussed below). Moreover, the trial judge was free to disbelieve the testimony that someone with as poor a credit history as Mr. MacLeod could, in fact, qualify for financing, and also the testimony that the MacLeods’ application was denied because of a prior repossession of a motor vehicle.[3]
This evidence clearly could not have supported a finding that Commonwealth was liable under Chapter 93A on a theory that it was a subsidiary of Constitution. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619 (1968); Bump v. Robbins, 24 Mass. App. Ct. 296, 315-316 (1987). However, Constitution remained liable for the conduct of one of its employees who was acting within the scope of her employment. See International Brotherhood of Police Officers, Local 433 v. Memorial Press, Inc., 31 Mass. App. Ct. 138, 140 (1991). Here, the activities of Ms. Perry would satisfy the test set out in Pinshaw v. Metropolitan Dist. Commn., 402 Mass. 687 (1988), so that Constitution would be responsible for her acts.[4] And, limited as it was, the evidence would not have precluded a finding that Commonwealth enticed the applicants into this scheme and that Constitution, through Perry’s actions, aided this scheme by merely going through the motions of seeking financing, all without any likelihood of success.
2. Constitution also argues that the trial court erred in admitting into evidence a letter which was ostensibly from Constitution’s president and on Constitution letterhead, and was addressed to a prospective home buyer other than the MacLe-ods. The letter begins with the words: “Congratulations! You are on your way to home ownership often referred to as the ‘American Dream.’” It then goes on to indicate that Constitution has been selected by Commonwealth as the addressee’s “mortgage source” and seeks certain information from him. Commonwealth’s initials appear under those of the author and typist. The MacLeods’ first attempt to introduce this letter during Ms. Perry’s testimony was unsuccessful. However, when Constitution’s president, Gregory Leonard, later testified, he was shown the letter. When asked if it was a form letter used by Constitution, he stated: “I don’t know that to be true.” Despite his further testimony that he would not have authorized or signed such a letter, the letter was admitted into evidence over Constitution’s objection. The MacLeods did not testify that they had received such a letter; no other witness, including the addressee, testified about it.
“Generally, for documents (including business records) to be admissible, regardless of the purpose for which they are being offered, they must be identified, shown to be relevant, and authenticated by a witness who is familiar with them.” Commonwealth v. Duddie Ford, Inc., 28 Mass. App. Ct. 426, 435 (1990). See also Cambridge YWCA v. Franks, 1998 Mass. App. Div. 242, 243.
A thing, however, rarely authenticates itself. Such proof of authenticity usually takes the form of testimony from a qualified witness that either *242 (1) the thing is what its proponent represents it to be or (2) circumstances exist that imply that the thing is what its proponent represents it to be.
P.J. LIACOS, HANDBOOK OF MASSACHUSETTS EVIDENCE, 684 (6th ed. 1994). In the case at bar, there was insufficient evidence to authenticate the letter in question. There was no evidence that this was a letter in fact sent to the MacLe-ods, to the addressee on the letter, or to anybody else by a representative of Constitution. Indeed, there was evidence to the contrary, suggesting that its text may have been superimposed on Constitution’s letterhead. Finally, the admission of this document cannot be considered harmless error. As discussed above, the evidence implicating Constitution in any G.L.c. 93A violation was tenuous. Since this letter did not actually relate to the MacLeods’ application for financing, its significance was twofold. It served to blur the distinction between Commonwealth and Constitution, even perhaps indicating that a Commonwealth employee prepared correspondence on behalf of Constitution’s president. If credited, it also implicated Constitution in the enticement of prospective applicants by the lure of home ownership which, for the MacLeods, may be viewed as unrealistic and therefore unfair or deceptive. Nothing in the trial judge’s findings indicates that he did not consider the letter in drawing his ultimate conclusions. His consideration of the letter is in fact consistent with his finding that “Constitution became entwined in the Commonwealth operation, such that they jointly participated in the processing of the [MacLeods’] mortgage application.”
Accordingly, the trial court’s judgment for the plaintiffs is vacated, and this case is returned to the Ayer Division for a new trial.
So ordered.

 While these additional facts were not expressly found by the trial judge, they are not inconsistent with, and may be reasonably found to be implicit within, the court’s subsidiary (albeit, fairly general) findings.

 “[T]he finder of fact must consider whether the conduct complained of is of the kind the employee is hired to perform, whether it occurs within authorized time and space limits, and whether ‘it is motivated, at least in part, by a purpose to serve the employer.’” Id. at 694, quoting from Wang Labs, Inc. v. Business Incentives, Inc., 398 Mass. 854, 859-860 (1986).