NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

11-P-2166                                          Appeals Court

COMMONWEALTH  vs.  GLORIA PEREZ.


No. 11-P-2166.

Essex.      December 10, 2015. - February 3, 2016.

Present:  Kafker, C.J., Milkey, & Sullivan, JJ.


Larceny.  Bank.  Constitutional Law, Confrontation of witnesses.
    Practice, Criminal, Confrontation of witnesses.  Evidence,
    Hearsay, Verbal conduct, Business record, Authentication of
    document.


    Indictments found and returned in the Superior Court
Department on April 30, 2008.

    The cases were tried before Leila R. Kern, J.


    Andrew S. Crouch for the defendant.
    Philip Anthony Mallard, Assistant District Attorney, for
the Commonwealth.


    MILKEY, J.  "[W]here's Phyllis?"  A bank teller posed that

question to the defendant who was seeking to withdraw $300 from

the checking account of an absent bank customer.  The defendant,

who worked as a customer service representative at the bank, had

presented a withdrawal slip purportedly signed by Phyllis Wall,

an elderly customer who relied on a walker and was well known to the employees at that particular branch. In response to the question, the defendant stated that Wall had signed the withdrawal slip earlier that day and that she planned to give the money to Wall later. The teller gave the defendant the money, but then notified the branch manager about the transaction.[1] An internal investigation ensued, and the defendant ultimately was indicted for twenty-six property offenses, all related to alleged theft from customer accounts. After trial, a Superior Court jury convicted the defendant of six of those offenses: two counts of larceny over $250, one of which was from a person sixty years or older (G. L. c. 266, § 30[1], [5]), two counts of forgery (G. L. c. 267, § 1), and two counts of uttering (G. L. c. 267, § 5). On appeal, she challenges the admission of various bank records, and she claims that the evidence for one of the larceny charges was insufficient in one respect. We affirm.

Background. The Phyllis Wall withdrawals. Five of the six convictions involved Wall. The defendant frequently assisted Wall with her transactions, such as obtaining money orders to pay all of her bills. The five convictions related to Wall involved two cash withdrawals, including the one described

_____

[1] Making cash withdrawals for customers who were not physically present was a violation of bank policy.

above, which took place on July 21, 2006. As noted, the withdrawal slip that the defendant presented during that transaction was purportedly signed by Wall. Wall was not available to testify as to whether the signature on the slip was her own, because she had died by the time of trial. However, the jury were able to compare that allegedly forged signature against genuine signatures from Wall on other documents entered in evidence.

The July 21, 2006, withdrawal slip purportedly signed by Wall also bore the initials of the defendant beside the words "ID only." That annotation signified that the teller could cash the withdrawal slip without checking Wall's identification, because the defendant had already done so. As documented by other bank records, thirteen minutes after receiving the $300 cash from Wall's account, the defendant deposited $200 cash into her own bank account through a different teller.

The other relevant transaction involving Wall was a withdrawal of $1,000 from her checking account on June 5, 2006. Like the other transaction, the withdrawal slip bore a signature that did not appear to match Wall's, as well as the defendant's initials alongside an "ID only" annotation. A minute after the $1,000 was withdrawn from Wall's account, the defendant deposited the same amount into the account of another customer, Judson Silva. The Commonwealth's theory was that the defendant

used the $1,000 from Wall to replace $1,000 she previously had taken from Silva.[2]

For each of the two withdrawals from Wall's account, the defendant was convicted of forgery and uttering.  She was also convicted of one count of larceny over $250 from Wall, a person over sixty years old.

The Hector Rodriguez withdrawals.  The defendant's remaining conviction was for larceny over $250 involving a different customer, Hector Rodriguez.  Rodriguez was a Spanish speaker, and he regularly had sought the defendant's assistance because she also spoke Spanish.  The bank's internal fraud investigator, Thomas Backstrom, scrutinized Rodriguez's transactions because bank records revealed that the defendant had spent an unusual amount of time accessing his accounts, and those of Wall and a third individual.[3]  The bank's branch manager later discovered signature cards from these three individuals in the defendant's desk.

---

[2] Silva had deposited a $48,000 foreign check into his checking account, but the bank put a hold on his accessing those funds.  He approached the defendant about this problem, and she informed him that the hold could be removed but that he would be charged a $1,000 fee.  As the branch manager during that time period testified, there was no such fee under bank policy.  After the hold was removed, Silva pressed the defendant to have the "fee" refunded.

[3] The defendant was charged with, but acquitted of, various offenses involving the third individual.

Rodriguez had credit problems, and the defendant assisted him in addressing those problems and in paying his bills. The Commonwealth introduced records that showed that Rodriguez made significant withdrawals (or similar cash outs) on seven occasions, and that many of the transactions bore the defendant's initials.[4] Rodriguez testified that he never received any cash from those transactions. He also testified that the defendant went to see him at his workplace and unsuccessfully tried to get him to sign a letter stating that bank officials had "forced [him] to sign the papers."[5]

The defendant's interview. On August 2, 2006 (that is, less than two weeks after the "where's Phyllis?" incident), Backstrom, the bank's investigator, interviewed the defendant. According to Backstrom's testimony, the defendant admitted that she -- not Wall -- had signed the withdrawal slip for the $300 withdrawal, but she claimed that she later brought the money to Wall's home and left it in her mailbox. She admitted to making the $1,000 withdrawal from Wall's account, but denied depositing it into Silva's account (claiming she did not know who made that deposit). She also denied having copies of the three signature

_____

[4] Some of the paperwork was in Rodriguez's handwriting and some was not. The defendant was not charged with forgery or uttering for any of the Rodriguez transactions.

[5] The trial testimony never clarified which specific "papers" were being referenced.

cards at her desk.  Once the questioning became more pointed and Backstrom began asking the defendant about customers claiming that they had not received the money from withdrawals that she had initiated, the defendant's demeanor changed.  Then, during a break in the interview, she abruptly left, stating "that she had nothing else to say and that if she was fired, she was fired."

The introduction of bank records.  At trial, the Commonwealth proffered a number of documents in support of its case, such as the withdrawal slip from the July 21, 2006, transaction.  It bears noting that some of those were compound documents; that is, they included written information added by different people (or by automated teller equipment) at different points in time.  For example, the withdrawal slip from the July 21 transaction included the underlying bank form, the information added to the form by the person seeking to withdraw the money (amount, signature, and date), the defendant's initials and "ID only" annotation, and the ink "spraying" added to the slip by a machine when the withdrawal was processed by the teller (showing date, time, and teller number).

The prosecutor sought to introduce the bank documents through the testimony of Backstrom.  Although Backstrom had no formal law enforcement background, he had worked as a fraud investigator for the bank for eight years at the time of trial, before which he had worked as a teller supervisor.  His

testimony during a pretrial voir dire[6] and at trial revealed his extensive familiarity with how the diverse bank records are created and electronically stored, as well as how such records could be accessed and reproduced in hard copy format. Additional facts regarding the introduction of the documents are reserved for later discussion.

The defense.  The defendant took the stand.  She acknowledged that she made both of the withdrawals from Wall's checking account, but denied that she committed any offenses in doing so.  With respect to the $300 withdrawal, she testified that Wall had presigned the withdrawal slip (in contrast to Backstrom's testimony that the defendant had admitted to him that she signed Wall's signature).  The defendant also claimed that she in fact hand-delivered the money to Wall later the same day and that the $200 deposit that she made to her own account directly after the withdrawal was from a different source.  With respect to the $1,000 withdrawal, the defendant acknowledged that she transferred the money from Wall's account into Silva's account, but she claimed that she simply was rectifying a

---

[6] The Commonwealth filed a motion in limine seeking to introduce "affidavits of forgery" that bank customers had completed regarding the individual transactions.  After hearing Backstrom's voir dire testimony, the judge ruled that these documents could not be introduced and that the Commonwealth instead would have to offer the individual transactional records and testimony from the relevant bank customers still living.

ministerial error she had made earlier.[7] With respect to the Rodriguez transactions, the defendant testified that Rodriguez in fact authorized all the withdrawals and received the cash.

Discussion. The bank records. The defendant challenges the introduction of the relevant bank records on two different statutory grounds, which we will address in turn. Before doing so, however, we frame the nature of the evidentiary disputes before us. The defendant claims that the introduction of the documents allowed hearsay into evidence, and that this in turn violated her rights pursuant to the confrontation clause of the Sixth Amendment to the United States Constitution. However, she does not identify any out-of-court statements contained in the documents that were admitted for their truth. See Commonwealth v. Siny Van Tran, 460 Mass. 535, 550 (2011), citing Mass. G. Evid. § 801(c), at 230 (2011) ("The hearsay rule prohibits the admission only of out-of-court assertions offered to prove the truth of the matter asserted"). For many of the records, such as the underlying withdrawal and deposit slips, the statements contained therein were "not offered to prove the truth of the matter [they] asserted, but rather only for the fact that [they were] made." Commonwealth v. Sullivan, 410 Mass. 521, 526 (1991). Indeed, such embedded statements did not constitute

---

[7] According to the defendant, she had put $1,000 aside from Silva's account to cover potential fees and mistakenly had deposited that into Wall's account.

"factual assertion[s] at all," Williams v. United States, 458 U.S. 279, 284 (1982), but were instead "legally-operative verbal acts" with legal significance independent of the truth of any statement contained in them.  United States v. Pang, 362 F.3d 1187, 1192 (9th Cir. 2004).  The "verbal acts" doctrine also encompasses the initials and "ID only" annotations that the defendant added to the withdrawal slips before they were processed.[8]  See United States v. Bowles, 751 F.3d 35, 39-40 (1st Cir. 2014) (false signature endorsements on checks "recognized as verbal acts that are not hearsay"); Commonwealth v. Purdy, 459 Mass. 442, 452-453 (2011) ("operative words" bearing "independent legal significance" such as those "used to effectuate the commission of a crime" are not hearsay).  See also Mass. G. Evid. § 801(c), at 263 (2015).

Other records were generated automatically by the bank's computerized data management system when the transactions were processed (memorializing such information as the date and time of the transaction and which teller processed the transaction). Examples include the "cash out credit" slip that accompanied the July 21, 2006 withdrawal,[9] and the ink "spraying" that was added

---

[8] This is also of course true of signature cards and other signature exemplars the bank had on file.

[9] Indeed, the defendant herself testified that "[a] cash out credit is basically generated automatically when the teller does a transaction of any sort of withdrawing cash from any

to withdrawal slips when they were processed.  Any content
included in these records does not raise hearsay concerns.  See
Commonwealth v. Thissell, 457 Mass. 191, 197 n.13 (2010)
("Because computer-generated records, by definition, do not
contain a statement from a person, they do not necessarily
implicate hearsay concerns").  See also Mass. G. Evid. § 801(a),
at 260 ("'Statement' means a person's oral assertion, written
assertion, or nonverbal conduct" [emphasis added]).

In sum, the defendant has not identified any out-of-court
statements included in the relevant records that were admitted
for their truth.  As a result, the evidence did not raise a
confrontation clause issue.  See Tennessee v. Street, 471 U.S.
409, 413-414 (1985); Commonwealth v. Hurley, 455 Mass. 53, 65
n.12 (2009).  With no hearsay concerns raised by the records,
the defendant is left to argue that they were inadequately
authenticated.[10]

---

account. . . . [a]nd it would give you the date, time, the
branch number and the amount and the teller number."

[10] Theoretically, the records also would have to satisfy the
best evidence rule to the extent that it applies, but the
defendant does not press such a claim.  "The best evidence rule
provides that, where the contents of a document are to be
proved, the party must either produce the original or show a
sufficient excuse for its nonproduction."  Commonwealth v.
Ocasio, 434 Mass. 1, 6 (2001).  See Mass. G. Evid. § 1002.
Where, as here, the entity keeping the records has a system in
place to maintain accurate electronic copies of paper documents,
the production of the original is expressly excused by statute.
See G. L. c. 233, § 79E.  See also Mass. G. Evid. § 1003, at

General Laws c. 233, § 78.  At trial, the prosecutor treated the relevant documents as business records admissible pursuant to G. L. c. 233, § 78, a statutory exception to the hearsay rule.  To invoke that statute, the party proffering the document must demonstrate

> "that (1) the entry, writing, or record was made in good faith; (2) in the regular course of business; (3) before the beginning of the civil or criminal proceeding in which it is offered; and (4) it was the regular course of such business to make such memorandum at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter."

Siny Van Tran, 460 Mass. at 548.  The defendant argues that these prerequisites cannot be met for those documents that the Commonwealth claimed were forged, such as the withdrawal slips for the Wall withdrawals.  As the defendant puts it in her brief:  "the Commonwealth could not both purport to the court that the documents were forged in bad faith and records of fraudulent transactions not part of the bank's ordinary

---

353.  To the extent that any original records were in electronic format, "[t]he best evidence rule does not forbid the use of 'copies' of electronic records (including e-mails and text messages and other computer data files), because there is no 'original' in the traditional sense."  Commonwealth v. Salyer, 84 Mass. App. Ct. 346, 356 n.10 (2013), citing Commonwealth v. Amaral, 78 Mass. App. Ct. 671, 675-676 (2011); G. L. c. 233, § 79K.

business[,] and that they were exempted from the hearsay exclusionary rule as reliable business records."[11]

The defendant's argument is correct up to a point. To the extent that the Wall withdrawal slips were forged, they cannot qualify as business records made in good faith in the regular course of business.[12] See Commonwealth v. Williams, 63 Mass. App. Ct. 615, 618-619 (2005). However, the fact that some of the admitted documents did not qualify as business records within the meaning of G. L. c. 233, § 78, does not mean that they could not be admitted on a different basis. See Williams, supra. Here, as in Williams, the documents were being offered for nonhearsay purposes; whether they fell within the ambit of § 78 is beside the point so long as they otherwise could be authenticated properly. See id. at 619.

As far as authentication goes, Backstrom's demonstrated knowledge of the bank's record keeping system, together with the nature and circumstances of the withdrawal slips at issue,

---

[11] The defendant argues that this issue was preserved by various objections that touched on the application of the business records statute. The Commonwealth counters that no objections were raised with the specificity necessary to preserve the issue. Finding no error, we need not resolve the question.

[12] Had the withdrawal slips been made out by an actual customer, then they still, strictly speaking, would not have been business records, because a writing received by a business is not itself a record "made" by the business. See Wingate v. Emery Air Freight Corp., 385 Mass. 402, 409 (1982) (Liacos, J., concurring).

provided ample support for authenticating those documents.[13]  See

Commonwealth v. Duddie Ford, Inc., 28 Mass. App. Ct. 426, 435

(1990), S.C., 409 Mass. 387 (1991) ("documents were sufficiently

authenticated to be admitted to show what was on record at the

bank" where an officer of the bank provided testimony

identifying the bank's records and described their function).

See also Mass. G. Evid. § 901(a), at 333 (authentication

requirement met if testimony is "sufficient to support a finding

that the item is what the proponent claims it is").  There was

no requirement that the Commonwealth produce an eyewitness to

the creation of the records.  See Williams, supra at 619-620

(lack of direct testimony concerning the production of or

signature on a document not a bar to admissibility).  Nor was

there any requirement that the witness through whom the

documents were admitted formally be designated a keeper of the

records (a designation that would have added little to

Backstrom's demonstrated knowledge of the bank's record keeping

system).  Compare Bowles, 751 F.3d at 40; Beal Bank, SSB v.

Eurich, 444 Mass. 813, 818-819 (2005) (testimony of bank manager

provided sufficient authentication even though he lacked

"personal knowledge regarding the maintenance of the

predecessors' business records").

---

[13] Further, the defendant has failed to put forward any reason to doubt the authenticity of the records that she challenges.

     None of this is to say that the documents were introduced
in a model manner.  However, a "defendant is entitled to a fair
trial, not a perfect one."  Commonwealth v. Lodge, 431 Mass.
461, 476 (2000), citing Commonwealth v. Graves, 363 Mass. 863,
872-873 (1973).  In this regard, we note that the defendant
grossly overstates the role that the documentary evidence played
here.  For example, that the defendant used a withdrawal slip to
obtain $300 cash from Wall's checking account was independently
established by the teller's live testimony as well as by the
defendant's admissions to Backstrom (and eventually through her
trial testimony).  Moreover, her defense consistently was that
she gave the money to Wall, not that she did not take it in the
first place.

     General Laws c. 233, § 77.  The defendant's other appellate
argument is based on G. L. c. 233, § 77, an evidentiary statute
specific to bank records.  That section states that copies of
bank records

     "shall be competent evidence in all cases, equally with the
     originals thereof, if there is annexed to such copies an
     affidavit . . . stating that the affiant is the officer
     having charge of the original records, books and accounts,
     and that the copy is correct and is full so far as it
     relates to the subject matter therein mentioned."

G. L. c. 233, § 77.  Because the bank records introduced here were unaccompanied by any keeper of the records affidavit, the defendant argues that their admission was improper.[14]

This issue was not preserved at trial.  Although the defendant raised various objections to the introduction of the documents, at no point did she ever reference G. L. c. 233, § 77, or object on the ground that a required affidavit was absent.  Our review is therefore limited to whether the admission of the documents was error creating a substantial risk of a miscarriage of justice.  Commonwealth v. Irene, 462 Mass. 600, 608 n.16 (2012).

In any event, we discern no violation of the statute, much less a substantial risk of a miscarriage of justice.  The focus of § 77 is to ease the admission of copies of bank records by obviating the need for the proponent of the records either to call a live witness through whom the documents had to be introduced or to produce the original records (as might be deemed necessary under a strict application of the best evidence

---

[14] Section 77, unlike some other sections included within G. L. c. 233, does not require that the documents be submitted to court prior to trial and be made available for inspection. See, e.g., G. L. c. 233, § 79.  The defendant makes no claim that she lacked notice of what documents the Commonwealth was going to offer at trial.

rule).[15]  See Mass. G. Evid. §§ 901(b)(7)(A) & 1003, at 337-338,
353 (classifying § 77 as a statute that "deal[s] with
authentication" and "equalize[s] duplicates and originals").  We
do not view the statute as providing an exclusive means of
authenticating bank records, or as precluding a party from
authenticating a bank record through a live witness.[16]  See Mass.
G. Evid. § 902(d), at 341-342, 345 (describing § 77 as a means
of "[s]elf-[a]uthenticating" bank records to relieve the
necessity of showing "[e]xtrinsic evidence of authenticity").

    Our analysis is not inconsistent with Irene, the principal
case upon which the defendant relies.  In that case, at issue
was a hospital report from a treating physician that included a
statement that "[t]he patient [the defendant] states that he was
minding his own business while he was in a taxicab when he got
shot."  Irene, supra at 608.  The trial judge ruled that the
hearsay statement would have to be redacted if the physician's
report were admitted pursuant to the hospital records statute,

_____

[15] Section 77 dates to 1885, a time when bank records were
kept by hand and producing accurate copies acceptable as
evidence may well have been a nontrivial task.  See St. 1885,
§ 92.

[16] Nor do we view the statute as setting forth the only way
that the best evidence rule can be satisfied.  See note 10,
supra.

G. L. c. 233, § 79.[17]  See Irene, supra at 608.  However, the

judge allowed in evidence an unredacted version of the report

under the business records statute, G. L. c. 233, § 78.  See

Irene, supra at 606.  The Supreme Judicial Court ruled that this

was improper.  Id. at 616.  The court reasoned that where the

Legislature had placed specific limitations on the introduction

of hearsay contained in hospital records, the Commonwealth was

not free to avoid those limitations by recharacterizing the

hospital records as general business records.  Id. at 615-616.

The defendant before us argues that the bank records statute,

G. L. c. 233, § 77, is a specific statute analogous to the

hospital records statute, and that the Commonwealth cannot avoid

complying with it by having the documents admitted pursuant to

the general business records statute.  This analogy breaks down

under scrutiny.

The concern in Irene was over hearsay, not authentication.

With the Legislature having addressed the admissibility of

hearsay contained in hospital records in a particular fashion,

the court in effect ruled that § 79 occupied the field to the

exclusion of other hearsay statutes.  See Irene, 462 Mass. at

612-614 (explaining how § 79 addressed concerns different from

other hearsay exceptions, such as business records).  Section

_____

[17] General Laws c. 233, § 79, allows the admission of
hospital records only "so far as such records relate to the
treatment and medical history of such cases."

77, by contrast, does not address hearsay issues and instead serves a more limited function than § 79.[18]  We do not view § 77 as precluding the admission of bank records through other means.

Sufficiency.  The defendant additionally argues that the Commonwealth's evidence that she committed a larceny against Wall was legally insufficient in one respect.  In assessing such a claim, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), quoting from Jackson v. Virginia, 443 U.S. 307, 318-319 (1979).

To make out a case of larceny, the Commonwealth must prove inter alia that a defendant possessed "the specific intent to deprive the person of the property permanently."  Commonwealth v. Donovan, 395 Mass. 20, 25-26 (1985), quoting from Commonwealth v. Johnson, 379 Mass. 177, 181 (1979).  Because Wall had died before trial, she was not available to testify to

---

[18] As the Commonwealth acknowledges, to the extent that a bank record included hearsay, § 77 would not itself provide an exception allowing such hearsay to be admitted.  Far from addressing the admissibility of bank records in a comprehensive fashion, § 77 is not even the only evidentiary statute that specifically references such records.  See G. L. c. 233, § 77A (applicable to certain bank statements of account); G. L. c. 233, § 79A (applicable to copies of bank records in a similar fashion as § 77).  The defendant has not touched on either of these statutes.

whether she received the $1,000 from the June 5, 2006, withdrawal or the $300 from the July 21, 2006, withdrawal.  The defendant argues that, absent such affirmative proof (and in the face of her claim that Wall eventually did receive the money), the evidence was legally insufficient that she permanently intended to deprive Wall of the money.  This argument requires little discussion.  There was ample circumstantial evidence that would allow rational jurors to conclude, beyond a reasonable doubt, that the defendant intended to steal the money she took from Wall's account.  For example, with regard to the July 21, 2006, incident, there was evidence that the defendant had forged Wall's signature, lied to Backstrom about doing so, and deposited $200 cash into her own account directly after receiving the $300 cash from Wall's.  From such evidence, a rational trier of fact could have drawn the reasonable inference that the defendant intended to permanently deprive Wall of the money she withdrew.

<u>Judgments affirmed</u>.